CAMDEN COUNTY BOARD OF
CHOSEN FREEHOLDERS,
Plaintiff,

v.

BERETTA U.S.A. CORP.,
et al., Defendants.

No. CIV. A. 99–2518 JBS.

United States District Court,
D. New Jersey.

Dec. 5, 2000.

Lisa J. Rodriguez, Kenneth I. Trujillo, Ira Neill Richards, Louis C. Ricciardi Trujillo Rodriguez & Richards LLC, Haddonfield, NJ, John A. Misci, Jr., City Attorney, Camden, NJ, Steven E. Fineman, Robert J. Nelson, Jonathan D. Selbin, Lieff Cabraser Heinmann & Bernstein LLP, New York, NY, Richard S. Lewis, Joseph M. Sellers, Ari Karen, Michelle A. Exline, Cohen Milstein Hausfeld & Toll PLLC, Washington, D.C., Jonathan Schub, Sheller Ludwig & Badey, Philadelphia, PA, Dennis A. Hennigan, Brian J. Siebel, Jonathan E. Lowy, The Center To Prevent Handgun Violence Legal Action Project, Washington, D.C., David Kairys, Kairys Rudovsky Epstein Messing & Rau, Philadelphia, PA, for Plaintiff.

John Renzulli, Anthony M. Pisciotti, Leonard Rosenbaum, Renzulli & Rutherford, Hackensack, NJ, for Defendants Arms Technology, Inc., Glock, Inc., Eagle Imports, Inc., and Import Sports, Inc.

William M. Griffin, III, Friday Eldredge & Clark, Little Rock, AR, Of Counsel, for Defendant Arms Technology, Inc.

Louis R. Moffa, Jr., Craig A. Livingston, Schnader Harrison Segal & Lewis LLP, Cherry Hill, NJ, Lawrence S. Greenwald, Gordon, Feinblatt, Rothman, Goffberger & Hollander LLC, Baltimore, MD, for Defendant Beretta U.S.A. Corp.

David R. Gross, Timothy A. Bumann, Pamela B. Betlow, Dana S. Mancuso, Budd Larner Gross Rosenbaum Greenberg & Sade PC, Short Hills, NJ, for Defendants Bryco Arms, Inc. and Taurus International Manufacturing, Inc.

James C. Sabalos, Newport Beach, CA, Of Counsel, for Defendant Bryco Arms, Inc.

Alan E. Kraus, Riker Danzig Scherer Hyland & Perretti LLP, Morristown, NJ, Robert Klonoff, Thomas E. Fennell, Jones Day Reavis & Pogue, Washington, D.C., for Defendant Colt's Manufacturing, Inc.

Timothy G. Atwood, Shelton, CT, for Defendant International Armaments Corp.

Louis Niedelman, Cooper Perskie April Niedelman Wagenheim & Levenson, Atlantic City, NJ, James R. Branit, Bullaro & Caston, Charterted, Chicago, IL, for Defendant Navegar, Inc., d/b/a Intratec USA Corp.

Joseph Tripodi, Post Polak Goodsell & MacNeil, Roseland, NJ, for Defendant Navy Arms Co., Inc.

Steven Kudatzky, Bradley T. Beckman, Beckman and Associates, Philadelphia, PA, for Defendant North American Arms, Inc.

Robert C. Tarics, Tarics & Carrington PC, Houston, TX, for Defendant Phoenix Arms.

William Krauss, Robert L. Joyce, Wilson Elser Moskowitz Edelman & Dicker, Newark, NJ, for Defendant Sigarms, Inc.

Louis John Dughi, Jr., Dughi and Hewitt, Cranford, NJ, James P. Dorr,

Anne G. Kimball, Wildman Harrold Allen & Dixon, Chicago, IL, for Defendants Smith & Wesson Corp. and Sturm, Ruger & Co., Inc.

Richard Mayberry, Mayberry & Associates, Washington, D.C., for Defendant American Shooting Sports Council, Inc.

Douglas E. Kliever, Cleary Gottlieb Steen & Hamilton, Washington, D.C., for Defendants National Shooting Sports Foundation and Sporting Arms and Ammunition Manufacturer's Institute, Inc.

**248**

## *OPINION*

SIMANDLE, District Judge:

## *TABLE OF CONTENTS*

I. *INTRODUCTION* ................................................248

II. *BACKGROUND* ................................................249
   A. *Procedural History* ...........................................249
   B. *Factual Allegations in the Second Amended Complaint* .....................250

III. *DISCUSSION* ................................................252
   A. *Motion to Dismiss Standard* ....................................252
   B. *Whether New Jersey's Products Liability Act Subsumes and Requires*
      *Dismissal of Plaintiff's Claims* .........................................253
   C. *Constitutional Law Issues* ....................................253
   D. *Whether the Second Amended Complaint Improperly Aggregates Claims* .....255
   E. *Negligence Claims: Standing and Proximate Cause* ......................255
      1. *Injury in Fact* .....256
      2. *Whether the County's Alleged Injuries Are Caused by or Fairly*
         *Attributable to the Challenged Action of the Defendants* .....256
         a. *Factor One: Causal Connection* ...............................259
         b. *Factor Two: Specific Intent to Harm*..............................259
         c. *Factor Three: The Nature of the County's Injury* ...................259
         d. *Factor Four: Directness/Indirectness of Injury* ...................261
         e. *Factor Five: Highly Speculative Damages* .......................263
         f. *Factor Six: Avoiding Trial Complexity*............................263
         g. *Summary of Proximate Cause* .................................264
   F. *Public Nuisance Claim* ........................................264
      1. *Whether the County Has the Power to Sue in its Public Capacit y to*
         *Abate a Public Nuisance* .....265
      2. *Whether the Plaintiff's Public Nuisance Claim Should Be Dismissed*
         *Because it Requests Relief That Includes Governmental Costs* .....265
      3. *Analysis* .....266

V. *CONCLUSION* ................................................267

## I. *INTRODUCTION*

In this noteworthy case, the governing body of Camden County, New Jersey (the "County" or "Camden County") has taken aim against various firearms manufacturers (collectively the "defendants"), claiming that their wrongful conduct in marketing and distributing handguns has facilitated the creation of a criminal market for handguns within County borders. As described in its detailed 40–page Second Amended Complaint, the County seeks injunctive and monetary relief in compensation for harm suffered by the County due to the defendants' allegedly reckless and negligent handgun marketing and distribution policies and practices, and due to the defendants' alleged creation of a public nuisance in Camden County that has endangered public safety, health and peace.

Several of the named manufacturing defendants[1] presently move to dismiss the

1. The named defendants are:
  1. Beretta U.S.A. Corp., a Maryland Corporation;
  2. Browning Arms Co., a Utah Corporation;
  3. Bryco Arms, Inc., a Nevada Corporation operating in California;
  4. Colt's Manufacturing, Inc., a Delaware Corporation operating in Connecticut;
  5. Glock, Inc., a Georgia Corporation;
  6. H & R 1871, Inc., a Massachusetts Corporation;
  7. Lorcin Engineering, a California Corporation;
  8. Carl Walther GmbH, a German Corporation;

County's complaint pursuant to Rule 12(b)(6), Fed.R.Civ.P., the resolution of which calls upon this Court to address several issues of first impression under the laws of this state and the Third Circuit.

The principal issues to be decided are: (1) whether Camden County's complaint in this case is sufficient to allege that the County's injuries (that is, the increased costs of governmental functions due to law enforcement related to illegal use of handguns) are caused by or fairly attributable to the alleged negligence of these manufacturers in their marketing and distribution of legal firearms; and (2) whether Camden County's complaint states a cognizable claim under New Jersey law that these manufacturers control or participate to a substantial extent in the creation of a public nuisance (that is, the criminal market for illegal handguns) within the county. This case, and therefore this Opinion, is not about conduct of local handgun distributors or local retailers who actually sell to the public, nor does Camden County allege that the manufacturers' marketing practices violate federal or state statutes. Further, the Court does not determine whether the defendants are doing all that they reasonably can or should do to diminish the risks that their handguns end up in the hands or criminals.

As discussed in detail below, the Court finds that the County lacks constitutional standing to assert its negligence claims because its injury—increased governmental costs—is too attenuated from the distribution policies of the manufacturers, and the negligence-based claims therefore fail to allege that the County's expenditures are caused by or fairly attributable to the manufacturers' negligence. Second, the Court further finds that, under New Jersey law, Camden County generally has the legal authority to seek to abate a public nuisance and to receive compensation for the remedy of a public nuisance, but that these manufacturers, who distribute lawful handguns in compliance with existing federal and state statutes, may not be held liable for creating or maintaining the public nuisance of which Camden County complains.

Having considered the parties' submissions, and having twice heard extensive oral argument on these submissions, and for reasons discussed herein, the defendants' motion to dismiss will be granted.

## II.  BACKGROUND

### A.  Procedural History

Camden County seeks compensation for its expenditures arising from handgun-related violence within its borders, and seeks to prevent such violence and expenditures from occurring in the future.[2]  In further-

9.  Navegar, Inc., d/b/a Intratec U.S.A. Inc., a Florida Corporation;
10. Phoenix Arms, a California Corporation;
11. Smith & Wesson Corp., a Delaware Corporation operating in Massachusetts;
12. Sturm, Ruger & Co., Inc., a Delaware Corporation operating in Connecticut;
13. Forjas Taurus, S.A., a Brazilian Corporation;
14. Hi–Point Firearms, an Ohio Corporation;
15. Raven Arms, a California Corporation;
16. Republic Arms, a California Corporation.
(SAC ¶ 3.) Plaintiff has also included as defendants John Doe manufacturers (1–100), John Doe distributors (1–100), and John Doe dealers (1–100).  (SAC ¶ 4.)
    Only eleven (11) defendants have joined in the present motion to dismiss: Beretta U.S.A.; Browning Arms; Bryco Arms; Colt's Manufacturing; Glock; Hi–Point; H & R 1871; Navegar; Phoenix Arms; Smith & Wesson; and Sturm, Ruger & Co. The Court will proceed on the assumption that the present motion pertains only to plaintiff's claims against the movant-defendants.

2.  The claims by Camden County in the present lawsuit correspond to those asserted by municipalities nation-wide against many of the world's largest distributors and manufacturers of handguns. Several of these lawsuits were filed at the state court level, which the defendants unsuccessfully tried to remove to federal court.  The City of Camden was among the plaintiffs filing in state court.  After defendants removed the case, this Court, like every other Court to have considered the issue, rejected the firearms defendants' at-

ance of these aims, the County presently asserts three causes of action against 16 handgun manufacturers. These three causes of action are: (1) public nuisance; (2) negligent entrustment; and (3) negligence in marketing and distribution. These claims have been refined through a series of amendments to the pleadings.[3]

## B. *Factual Allegations in the Second Amended Complaint*

In its Second Amended Complaint (SAC), plaintiff alleges that Camden County has suffered immense hardship as a direct result of the defendants' reckless and negligent misconduct in the manufacture, distribution, sale, marketing and design of their firearms. (SAC ¶ 1.) The defendants are manufacturers of handguns who are not engaged in direct sales; instead, they sell the handguns to licensed distributors, who then sell to licensed retailers, who then sell to the purchaser. None of these transactions is claimed to violate existing statutes or regulations, and the County does not contest that these sales involve lawful firearms transactions. Instead, the County maintains that a substantial portion of the handgun market consists of "multiple sales"—one person legally buying two or more handguns at the same time or over a period of time. (*Id.* ¶ 18.) According to the County, the next step is generally that this multiple purchaser will re-sell the gun to someone else, often someone barred from purchasing a handgun directly.

The County also alleges that a large percentage of persons involved in multiple handgun purchases are allegedly engaging in "straw purchases" where the buyer is really buying for a third party who may be prohibited from buying a gun by state or federal law. (*Id.* ¶ 21.) Under the system

tempt to remove to the case to this Court on the asserted ground that federal firearms regulations preempted the plaintiffs' state law claims. *See City of Camden v. Beretta*, 81 F.Supp.2d 541 (D.N.J.2000) (Simandle, J.). *Accord, City of Gary v. Smith & Wesson Corp.*, 94 F.Supp.2d 947, 949 (N.D.Ind.2000); *Archer v. Arms Tech., Inc.*, 72 F.Supp.2d 784 (E.D.Mich.1999); *McNamara v. Arms Tech., Inc.*, 71 F.Supp.2d 720 (E.D.Mich.1999); *Penelas v. Arms Tech., Inc.*, 71 F.Supp.2d 1251 (S.D.Fla.1999); *Boston v. Smith & Wesson Corp.*, 66 F.Supp.2d 246 (D.Mass.1999). This Court thus remanded the *City of Camden* case to the Superior Court of New Jersey. *City of Camden v. Beretta*, 81 F.Supp.2d at 550.

**3.** Plaintiff first filed suit in this Court on June 1, 1999 against twenty-one (21) firearms manufacturers and one distributor, asserting, *inter alia*, causes of action for assault, intentional interference with economic advantage, strict liability, negligence, and public nuisance. Plaintiff filed a First Amended Complaint on August 11, 1999, excluding one manufacturer defendant and adding two new manufacturer defendants. The First Amended Complaint retained the public nuisance claim, omitted the assault claim, re-pled the strict liability claim, and added negligent distribution and marketing and consumer fraud claims.

Defendants filed a Motion to Dismiss plaintiff's First Amended Complaint on August 24,

1999. After briefing, this Court heard extensive oral argument on defendants' motion on December 17, 1999. During this argument, the Court expressed its concerns about the County's standing to bring suit on behalf of injured Camden County citizens. In reply, the County suggested that the Court should allow it leave to amend its complaint to address the Court's concerns. The Court reserved decision on both the pending motion to dismiss and plaintiff's request for leave to amend.

On January 7, 2000, plaintiff filed a Motion for Leave to File a Second Amended Complaint pursuant to Rule 15(a), Fed.R.Civ.P. The proposed Second Amended Complaint abandoned the County's strict liability, consumer fraud and intentional interference with economic advantage claims. By Order dated February 16, 2000, this Court granted plaintiff leave to amend, and the Second Amended Complaint was substituted for the First Amended Complaint. The Court's Order also dismissed plaintiff's strict liability, consumer fraud, and intentional interference with economic advantage claims with prejudice. The Court also dismissed without prejudice defendants' Motion to Dismiss the First Amended Complaint, granting defendants until March 16, 2000 to answer or otherwise plead to plaintiff's Second Amended Complaint. Defendants filed the present Motion to Dismiss on April 24, 2000, and the Court again heard extensive oral argument on May 15, 2000.

of multiple purchases allegedly facilitated by defendants' loose control over the nation's licensed firearm distributors, most guns end up Camden County as the result of the defendants' allegedly reckless manner distribution.[4]

The County claims that, beyond simply placing their goods into the stream of commerce, the defendants actually facilitate the criminal market for handguns. The defendants allegedly produce, market and distribute substantially more handguns than they reasonably expect to sell to law-abiding purchasers; they allegedly continually use distribution channels that they know yield criminal and underage end users in Camden County; they allegedly do not monitor or supervise their distributors with respect to multiple purchases; and they fail to adopt even minimal practices or procedures that would eliminate or lessen the criminal market for handguns. (*Id.* ¶¶ 14–15.)

Plaintiff alleges that the BATF gun trace process provides defendants with actual notice that their guns are being used in the commission of crimes, and that these BATF data identify which gun distributors sell an inordinate percentage of crime guns. Under the BATF trace process, plaintiff explains, each time a gun is recovered as part of a criminal investiga-

tion, the BATF informs the manufacturer of that gun the model and serial number of the gun used in the commission of a crime. The County maintains that the manufacturer knows, through its own records, the particular distributor through whom that gun was first distributed.[5]

Plaintiff asserts that the defendants' failure to react to gun trace data by taking steps to prevent guns from reaching criminals is reckless and negligent. The County further claims that as a result of defendants' reckless and/or negligent conduct, it has incurred a myriad of significant and substantial governmental costs associated with the illegal and/or improper possession and use of firearms within the County. Among the County agencies cited as incurring additional costs due to handgun violence are the offices of the Camden County Prosecutor, Sheriff, Medical Examiner, and Park Police, the County Correctional Facility, and the Camden County courts. (*Id.* ¶ 2.) Significantly, the County does not claim it has suffered direct damage to its property or harm to its personnel as a result of defendants' conduct.

The County's Second Amended Complaint states three causes of action. The first is public nuisance. Under this theory, the County asserts that defendants have knowingly, recklessly or negligently

4. As evidence of this pattern of secondary sales, the County cites to a 1999 Congressional study of data compiled by the Bureau of Alcohol, Tobacco and Firearms (BATF), which indicates that an extraordinary proportion (87%) of guns used in state, federal and local crimes were possessed by someone other than the buyer. This study also found that fully one-third of these crime guns were recovered in connection with the commission of a crime within one year of purchase, and half were traced to crimes within two years of purchase. (*Id.* ¶¶ 24(a)-(b).)

5. The County contends that because of the information they receive from BATF trace data, the defendants are in the best position to determine which distributors and dealers feed the criminal market for handguns. According to the County, newly discovered BATF trace data confirms that a handful of the major distributors yields a very high percent-

age of the guns traced in connection with criminal activity. Thus, plaintiff contends, the BATF crime trace data provides a clear picture for each defendant of the crime-producing tendencies of its various distribution channels. (*Id.* ¶¶ 36–40.).

This data allegedly shows that 70% of crime-related guns recovered in Camden County came from outside New Jersey, most notably from the states of Pennsylvania, Virginia, North Carolina, Georgia, and Florida. In one example cited by the County, BATF data shows that during one six month period, a Georgia man purchased at least five small, inexpensive semiautomatic handguns, including three manufactured by defendant Lorcin, from two gun stores in Georgia. In 1996, within three years of these purchases, all five handguns were involved in crimes in Camden County. (*Id.* ¶¶ 58 & 59(b).)

interfered with public safety, health, and peace, and that defendants are liable to the County for the substantial financial costs necessary to abate the nuisance. (*Id.* ¶¶ 91–102.) The second cause of action is for negligent entrustment. Under this theory of recovery, the County asserts that the defendants negligently failed to monitor the sales and distribution of their lethal products, and that this negligence has facilitated the creation of a crime market, the prevention of which the County must devote additional personnel, resources, time and money. (*Id.* ¶¶ 103–109.) The County's third cause of action is for negligence, wherein plaintiff alleges that defendants breached their duty to act in a reasonably prudent manner regarding the marketing and distribution of their lethal products so as to reduce the risks of their handguns being available for criminal use in Camden County. (*Id.* ¶¶ 110–115.)

As relief, the County seeks (1) compensation for the cost of abating the public nuisance allegedly created by defendants' conduct, (2) injunctive relief forcing defendants to change their marketing and distribution practices, (3) compensatory damages for defendants' negligence, and (4) punitive damages based on defendants' allegedly intentional and reckless conduct. (*Id.* at Demand, p. 40.)

### III. *DISCUSSION*

#### A. *Motion to Dismiss Standard*

The defendants have moved to dismiss the Second Amended Complaint pursuant to Rule 12(b)(6), Fed.R.Civ.P. A motion to dismiss under Rule 12(b)(6) for failure to state a claim upon which relief can be granted does not attack the merits of the case, but merely tests the legal sufficiency of the Complaint. *See Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir.1996). When considering a Rule 12(b)(6) motion, the reviewing court must accept as true all well-pleaded allegations in the Complaint and view them in the light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90

(1974); *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994); *Palladino Ex Rel U.S. v. VNA of Southern New Jersey, Inc.*, 68 F.Supp.2d 455 (D.N.J.1999).

In considering the motion, a district court must also accept as true any and all reasonable inferences derived from those facts. *See Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1384 (3d Cir.1994); *Schrob v. Catterson*, 948 F.2d 1402, 1405 (3d Cir.1991). A court may not dismiss the Complaint "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Therefore, in deciding a motion to dismiss, a court should look to the face of the complaint and decide whether, taking all of the allegations of fact as true and construing them in a light most favorable to plaintiff as non-movant, the complaint's allegations state valid legal claims. *See Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir.1990).

In this case, the defendants argue that plaintiff's complaint should be dismissed because the County's claims are substantively deficient and are precluded by several defenses. Among the defenses defendants raise are (1) that New Jersey Product Liability law subsumes plaintiff's claims, (2) that the relief requested in the Second Amended Complaint violates the commerce and due process clauses of the federal constitution, (3) that plaintiff's complaint improperly aggregates claims, (4) that plaintiff's claims are derived from harm to third parties, namely, Camden County residents, and therefore are too remote to warrant recovery, and (5) that a municipality cannot recover the costs of municipal services. The Court will first address the proffered NJPLA, Commerce Clause, and aggregation defenses in Parts III.B, C, & D, below, and will then address the remoteness defense within the rubric of standing in relation to the Coun-

ty's negligence-based claims in Part III.E, below. The Court will then address the municipal cost recovery issue in the context of plaintiff's public nuisance claim in Part III.F, below.

### B. Whether New Jersey's Products Liability Act Subsumes and Requires Dismissal of Plaintiff's Claims

■ The Court first addresses defendants' argument that plaintiff's claims of negligence fall within the New Jersey Products Liability Act (NJPLA), N.J.S.A. 2A:58C–1, et seq., which is "the sole basis for relief under New Jersey law available to consumers injured by a defective product." *Port Auth. v. Arcadian Corp.*, 189 F.3d 305, 313 (3d Cir.1999) (quoting *Repola v. Morbark Indus., Inc.*, 934 F.2d 483, 492 (3d Cir.1991)).

This argument misinterprets plaintiff's claims. Rather than alleging that the defendant firearms manufacturers and distributors make and sell defective products, the County claims that, if anything, these products work *too* well. It is because of the deadly efficiency of firearms that the County seeks to prevent defendants from irresponsibly marketing and distributing their wares, not because of any defect or malfunction. The principal negligence issue in this case is whether defendants ignored data showing that some distributors and retailers routinely sold guns in a chain of transactions leading to criminals, or in a manner that facilitates the criminal market for handguns. The negligence-based claims in this case are thus distinguishable from *Arcadian,* 189 F.3d at 313, which dealt with preemption by the NJPLA of the Port Authority's negligence claims against a fertilizer manufacturer based on the premise that the defendant negligently formulated its product in such a way that it could easily be converted into explosives. *Id.* at 309. In contrast to this case, *Arcadian* did not involve allegations of negligent marketing, negligent entrustment or public nuisance based on a pattern of repeated misconduct. Because the

plaintiff's claims here do not amount to an allegation that the defendants' products were defective, the NJPLA does not preempt the County's claims in this case.

### C. Constitutional Law Issues

■ Defendants also argue that the relief sought by the County is an attempt to regulate a lawful national industry and that commerce in several states would be negatively affected should plaintiff prevail in this suit. Because of its potential effect upon national commerce, defendants argue, plaintiff's suit here is barred by the dormant commerce clause of the federal constitution. U.S. Const. Art. I, § 8.

■ The affirmative grant to Congress of authority to regulate interstate commerce encompasses an "implied [or "dormant"] limitation on the power of the States to interfere with or impose burdens on interstate commerce." *Healy v. Beer Inst.*, 491 U.S. 324, 326 n. 1, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989). The dormant commerce clause limits the authority of the States to enact laws that regulate "commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the state." *Id.* at 336, 109 S.Ct. 2491 (quoting *Edgar v. MITE Corp.*, 457 U.S. 624, 642–43, 102 S.Ct. 2629, 73 L.Ed.2d 269 (1982)).

The Supreme Court has articulated two distinct tests to evaluate whether state legislation unconstitutionally regulates interstate commerce. When a state statute "directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests," it is subject to strict judicial scrutiny. *Brown–Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 578–79, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986). *See also Instructional Sys., Inc. v. Computer Curriculum Corp.*, 35 F.3d 813, 824 (3d Cir.1994). Alternatively, when a statute only indirectly affects interstate commerce and regulates evenhandedly, a determination must be made as to whether the State's interest is

"legitimate and whether the burden on interstate commerce clearly exceeds the local benefits." *Brown–Forman,* 476 U.S. at 578–79, 106 S.Ct. 2080.

As construed by the Third Circuit, these two tests actually translate to three separate levels of scrutiny in dormant commerce clause cases:

> (1) state actions that purposefully or arbitrarily discriminate against interstate commerce or undermine uniformity in areas of particular federal importance are given heightened scrutiny; (2) legislation in areas of peculiarly strong state interest is subject to very deferential review; and (3) the remaining cases are governed by a balancing rule, under which state law is invalid only if the incidental burden on interstate commerce is clearly excessive in relation to the putative local benefits.

*Juzwin v. Asbestos Corp.,* 900 F.2d 686, 689 (3d Cir.1990). *See also Atl. Coast Demolition v. Bd. of Chosen Freeholders,* 112 F.3d 652, 662 (3d Cir.1997) ("A statute triggers heightened scrutiny under the dormant Commerce Clause whenever that statute has a discriminatory purpose *or* effect on interstate commerce.") (emphasis added).

The applicability of the dormant commerce clause to causes of action under state tort law is unsettled. Typically, the cases focusing on the commerce clause have considered state statutes or regulations, not lawsuits. *See, e.g., Healy,* 491 U.S. at 326, 109 S.Ct. 2491 (Connecticut statute); *Brown–Forman,* 476 U.S. at 584, 106 S.Ct. 2080 (New York statute); *Kassel v. Consolidated Freightways Corp.,* 450 U.S. 662, 679, 101 S.Ct. 1309, 67 L.Ed.2d 580 (1981) (Iowa statute); *Hughes v. Oklahoma,* 441 U.S. 322, 323, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979) (Oklahoma statute); *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. 333, 354, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (Washington statute); *Bottineau Farmers Elevator v. Woodward–Clyde Consultants,* 963 F.2d 1064 (8th Cir.1992) (North Dakota statute);

*Juzwin,* 900 F.2d at 689 (New Jersey statute).

The Court's research uncovers only one case where the Supreme Court has applied the dormant commerce clause analysis to a civil lawsuit. *See BMW of N. Am. v. Gore,* 517 U.S. 559, 573, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (result of over-large punitive damages award may be to effect change in out of state practices). The other cases defendants cite for the proposition that the clause extends to civil suits are inapposite. *See New York Times v. Sullivan,* 376 U.S. 254, 265, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (enforcement of state libel law violated First Amendment); *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959) (NLRA barred state suit for economic damages caused by picketing).

Moreover, the Third Circuit has voiced doubt that suits brought under state common law can ever be subject to dormant commerce clause analysis. *See Buzzard v. Roadrunner Trucking, Inc.,* 966 F.2d 777, 784 (3d Cir.1992) (noting dormant commerce clause had never invalidated liability on principles of state common law). Every case that comes before this Court has some potential impact on interstate commerce. This is also true of every decision made in the courts of New Jersey. A case where a plaintiff seeks to prevent allegedly harmful consequences from occurring outside of its borders without respect to the citizenship of the defendant simply does not constitute the sort of state action contemplated by dormant commerce clause jurisprudence. Accordingly, the Court finds it doubtful that dormant commerce clause analysis applies to an action such as this one simply because a governmental entity is the plaintiff.

Even assuming that dormant commerce clause analysis is appropriate in this case, plaintiff's claims are not barred. As discussed above, the Third Circuit has applied three distinct standards of review in this context. The strictest standard of review

is reserved for state laws that purposefully or arbitrarily discriminate between residents and non-residents. *Juzwin,* 900 F.2d at 689. It is evident that the County's claims in this case do not require strict scrutiny. Under the County's theory of the case, the standards of liability are the same irrespective of whether the defendants are domiciled out of state, and regardless of whether their goods have moved in interstate commerce. The second and most lenient standard affords "very deferential review" in areas of particular state interest. While the health and safety of County residents is an important area of state interest, losses incurred by the public fisc do not seem to be sufficiently compelling to warrant deferential review.

The Court finds that plaintiff's claims in this case would almost certainly have a negative effect upon interstate commerce, but also that there would undoubtedly be strong local benefits involved if the county succeeded in stemming the tide of gun violence within its borders. The third and intermediate standard of review under *Juzwin* thus is the most relevant to the present case. Under this standard, the relevant state action or law must be upheld unless "the incidental burden on interstate commerce is clearly excessive in relation to the putative local benefits." *Id.* At the motion to dismiss stage, however, the Court cannot assess the relative burdens and benefits of the County's claims without a more fully developed record. Accordingly, the County's claim will not be dismissed on dormant commerce clause or due process grounds.

D. *Whether the Second Amended Complaint Improperly Aggregates Claims*

Defendants also argue that the complaint must be dismissed because it improperly aggregates claims that are factually diverse and individually could not survive the pleading stage. (Def. Br. at 16.) According to the defendants, the Second Amended Complaint does not contain a single allegation concerning a negligent or illegal firearm sale by any manufacturer, and, given the factual and legal issues and defenses implicated in each separate incident, consolidation of such claims in one case is inappropriate. (*Id.*)

The County responds that its claims are not an aggregation of claims arising from the injuries of individual gunshot victims, but rather the County is making specific allegations about the marketing and distribution practices of all defendants, and the resultant harmful effects on the County. (Pl. Br. in Opp'n at 35.)

The Court finds that this case does not involve improperly aggregated claims. Plaintiff's negligence-based claims are not a generalized grievance shared by a large class of citizens. Instead, the County asserts claims for certain losses the County has suffered. The harm alleged, which includes costs for police, sheriff, and prosecutorial response to defendants' allegedly wrongful conduct, is simply not the same as harm to individuals. Moreover, as explained more fully below, public nuisance law necessarily contemplates abatement of a condition harmful to a broad class of individuals.

The only question before the Court upon defendants' present motion under Rule 12(b)(6) is whether the County has pled legally plausible claims of public nuisance, negligence and negligent entrustment, and whether plaintiff's claims give adequate notice of the nature of those claims. *See Gooding v. Warner–Lambert Co.,* 744 F.2d 354, 358 (3d Cir.1984). The complaint meets these standards, and does not appear to aggregate individual claims.

E. *Negligence Claims: Standing and Proximate Cause*

The heart of the defendants' motion to dismiss is their argument that the County's negligence-based claims fail as a matter of law because they are mainly derivative of harm to third parties, namely, County residents. Defendants argue that,

because of the overly remote connection between the defendants' alleged malfeasance and the County's harm, plaintiff's complaint fails to state a cognizable theory of either standing to sue or proximate cause.[6]

■ The Court first must determine whether the County has constitutional standing to sue the defendant gun manufacturers. In order to have standing, a plaintiff must: (1) have suffered an "injury in fact," *i.e.*, an invasion of a legally protected interest that is both (a) concrete and particularized and (b) actual or imminent, as opposed to conjectural or hypothetical; that was (2) caused by or fairly attributable to the challenged action of the defendant; and that is (3) likely redressable by a favorable decision. *Friends of the Earth v. Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). *See also In re Ford Motor Co. Ignition Switch Prods. Litig.*, 39 F.Supp.2d 458, 471 (D.N.J.1999). Otherwise, the exercise of federal jurisdiction would be gratuitous and thus inconsistent with the Art. III limitation that federal courts only have jurisdiction over cases in which the plaintiff has made out an actual controversy between himself and the defendant. *Gladstone Realtors v. Village of Bellwood*, 441 U.S. 91, 99–100, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979).

■ Once established, lack of standing deprives this Court of subject matter jurisdiction. Thus, a challenge to standing is tantamount to a subject matter jurisdiction challenge. Although the lack of standing issue gives rise to a question of this Court's subject matter jurisdiction, the proper standard to be applied to the standing issue is that of a motion to dismiss

under 12(b)(6). *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406 (3d Cir.1991).

1. *Injury in Fact*

Here, the County has alleged that the injuries of Camden County citizens are distinct from the injuries suffered by the County. While individual citizens injured in a firefight may sue defendants for typical injuries such as pain, suffering, and loss of wages, the County asserts that only the government has standing to sue for the institutional costs of combating the flow of illegal handguns into the County. *See White v. Smith & Wesson*, 97 F.Supp.2d 816, 824–26 (N.D.Ohio 2000) (Cleveland has standing to sue for cost of abating public nuisance generated by gun manufacturers' faulty handgun design).

The Court finds that the harm alleged by the County—the governmental costs of preventing, prosecuting and punishing handgun crimes—would exist to some extent even if no individual had been injured, and that the County's alleged injury is distinguishable from that of its citizens. For instance, there are some cases where a gun-related charge is prosecuted even though no shots have been fired. The alleged costs of combating illegal gun possession do not flow solely from harm visited upon a third party; they are alleged to exist as a result of separate and direct harm defendants have visited upon the County itself. Accordingly, the County has properly alleged that it has suffered an "injury in fact."

2. *Whether the County's Alleged Injuries Are Caused by or Fairly Attributable to the Challenged Action of the Defendants*

The second element in the standing analysis is whether there is a causal connection between the plaintiff's injuries and

---

**6.** The Court declines to embrace defendants' proposed freestanding doctrine of "remoteness." Case law is clear that remoteness of injury is an element to be examined in determining whether a plaintiff has standing to sue because his injuries were proximately caused by the defendant's conduct. *See Steamfitters*, 171 F.3d at 921 ("Remoteness is an aspect of the proximate cause analysis.").

the conduct complained of, *i.e.*, that the injury is fairly traceable to the challenged action. Here, the County's claims of injury will be fairly traceable to the defendants' conduct if plaintiff is correct that the defendants' reckless marketing practices directly caused a flood of illegal handguns into Camden County, and that the County had to expend additional funds to combat the danger posed by readily available and inexpensive handguns. Defendants argue that the County's alleged harm in this case is not fairly attributable to the actions of the defendants, and thus the County's Second Amended Complaint asserts injury too remote and/or indirect to be actionable.

Because of the sheer number of causal links incorporated into to the County's theory of liability in this case, the Court finds it helpful to approach this "fairly traceable" prong by examining whether plaintiff has made factual allegations that amount to a legally plausible theory of "proximate cause." Although proximate cause is not typically part of the constitutional standing analysis, the proximate cause approach is warranted where, as here, the plaintiff's theory of liability involves suing a defendant over allegedly wrongful conduct several steps removed from the end harm. Generally, a plaintiff asserting tort claims against a defendant must assert a cognizable basis for asserting that its injuries have been proximately caused by the defendant's conduct. *See Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).

Part of the inquiry into whether a defendant's conduct proximately caused a plaintiff's injury is a determination as to whether there is "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* Thus, in general, "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by the defendant's acts [is] generally said to stand at too remote a

distance to recover." *Id.* at 268–69, 112 S.Ct. 1311.

The process of determining directness of injury is a flexible one. Rather than imposing rigid requirements for measuring proximate cause, the Supreme Court "has repeatedly noted that 'proximate cause is hardly a rigorous analytic tool.'" *Steamfitters Local 420 v. Phillip Morris, Inc.*, 171 F.3d 912, 922 (3d Cir.1999) (Becker, C.J.), *cert. denied*, 528 U.S. 1105, 120 S.Ct. 844, 145 L.Ed.2d 713 (2000) (quoting *Shield v. McCready*, 457 U.S. 465, 477 n. 13, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982)).

Plaintiff's negligence claims involve an attenuated theory of proximate causation of injury to the public fisc of Camden County. Reduced to its essence, plaintiff's theory is that, due to the reckless and negligent failure of the defendant gun manufacturers to monitor the conduct of licensed distributors and dealers, it has been forced to combat a staggering wave of gun related violence, and that the County has seen a corresponding increase in the cost of administering governmental services such as the police, jails and the courts due to handgun crimes.

Even granting plaintiff every favorable inference, the County eventually will have to establish that intervening causes such as criminal misuse and theft have not severed the causal chain between the alleged primary act of negligence (the failure of defendants to safely monitor the flow of their products), and the County's ultimate harm (additional costs incurred in dealing with the illegal use of guns in the County). Defendants argue that, even assuming for the purposes of the present motion to dismiss that the defendants were negligent and/or reckless, the County cannot show that it suffered *direct* harm, and thus its injuries are too remote from the alleged wrongful conduct to warrant recovery.

The Court agrees that the County's theory of causation involves a great number of links in the causal chain. In order to succeed in their negligence-based claims, the County would have to show that the

chain of causation was not severed by illegal conduct on the part of distributors and retailers, illegal conduct by the purchasers of handguns, or gun theft.[7]

Because of the complexity of plaintiff's theory of harm in this case, and because of the sheer number of links in the causal chain between defendants' alleged wrongdoing and the County's injuries, the Court finds it helpful to apply the proximate causation factors used in antitrust cases in order to determine whether the County's Second Amended Complaint sets forth a legally cognizable theory of proximate causation. *See Allegheny Gen. Hosp. v. Philip Morris, Inc.,* 228 F.3d 429 (3d Cir.2000) (approving district court's dismissal of complex state common law claims on grounds that plaintiff failed to establish proximate cause in antitrust context). The use of the antitrust proximate causation framework may be particularly apt here because the County claims solely economic damages as a result of defendants' business-related decisions; *i.e.,* damage to the public fisc due to increased expenditures on municipal services.[8]

■ Under the antitrust/proximate cause framework articulated by the Supreme Court in *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 538, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (hereinafter *AGC* ), lower courts should analyze the circumstances of the individual case, focusing on six key factors:

(1) the causal connection between defendant's wrongdoing and plaintiff's harm; (2) the specific intent of defendant to harm plaintiff; (3) the nature of plaintiff's alleged injury; (4) "the directness or indirectness of the asserted injury"; (5) whether the "damages claim is ... highly speculative"; and (6) keeping the scope of complex trials within judicially manageable limits, *i.e.,* "avoiding either the risk of duplicative recoveries on the one hand, or the danger of complex apportionment of damages on the other."

*Allegheny Gen. Hosp.,* 228 F.3d at 438–39 (quoting *Steamfitters,* 171 F.3d at 924).[9]

---

7. Obviously, the County cannot seriously allege that firearms manufacturers should be responsible for crimes committed with guns stolen from retailers or legitimate purchasers. *See* Note, *Developments in the Law—The Paths of Civil Litigation II. The Use of the Public Nuisance Tort Against the Gun Industry,* 113 Harv.L.Rev. 1759, 1772 (2000).

8. The Court notes that the Third Circuit in *Steamfitters* also analyzed proximate cause under the framework articulated in *Blue Shield v. McCready,* 457 U.S. 465, 477, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). *McCready* provides less guidance than does *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 538, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (*"AGC"*), however, because the Court in *McCready* dealt with proximate causation under the rubric of conspiracy. Because plaintiff has not alleged that defendants engaged in a conspiracy, nor that they fraudulently covered up evidence of their wrongdoing, the *ACG*-antitrust framework better fits the facts of this case. *Cf. Rotella v. Wood,* 528 U.S. 549, 120 S.Ct. 1075, 1083, 145 L.Ed.2d 1047 (2000) (observing that civil RICO cases frequently describe concealed or fraudulent patterns of conduct); William H. Page, *The*

*Scope of Liability for Antitrust Violations,* 37 Stan.L.Rev. 1445, 1463 (1985) (noting that the type of causation required for antitrust injury is causal linkage, *i.e.,* the practice that is prohibited must be predictably associated with the kind of harm that the plaintiff alleges).

This Court does not mean to suggest that the *AGC* /antitrust proximate framework is appropriate in all cases involving complex issues of causation, but rather only that this framework is useful in this particular case alleging economic harm due to the actions or omissions of remote actors in the marketplace. The claims here present several issues of first impression, and are premised on a novel theory of tort liability under which a municipality has sued the gun industry for negligent marketing allegedly leading to financial harm and public nuisance. It is because of the County's attenuated theory of proximate causation and the vast number of links in the causal chain that the Court chooses to analyze proximate causation under the rubric of antitrust.

9. This framework has recently been applied in the context of cases where pension health and welfare funds sued cigarette manufacturers

The Court now evaluates proximate cause through an independent examination of each of the *AGC* factors as applied to this case.

### a. *Factor One: Causal Connection*

There is a highly attenuated causal connection between the defendants' alleged misconduct and the County's injuries. As alleged by the County, but for the defendants' negligent and reckless conduct in connection with the distribution of firearms, the County would not have been forced to deal with the financial consequences of the flow of illegal firearms. Before Camden County is harmed by defendants' conduct, the following must occur:

- The manufacturer must deliver the handgun to the licensed distributor in a negligent manner because the manufacturer knows or should have known that the distributor resells to retailers who have a greater likelihood of selling guns into the county's criminal market. Manufacturers may deal with numerous distributors, and a given distributor deals with hundreds or thousands of licensed retailers;

- The gun lawfully passes from the distributor to the licensed retailers. Again, a given distributor may deal with hundreds of licensed retailers;

- The retailer sells it to a lawful purchaser. At that point, the purchaser may use the gun to commit a crime in Camden County, or may give or sell the gun to someone who commits the crime, and the victim of the gun crime then requires services from Camden County (such as a county ambulance) and the Camden County prosecutor investigates and charges the perpetrator, causing the County to expend money for the prosecutor, sheriff, court, and jail.

under federal antitrust laws to recover losses connected to paying for pension participants' smoking-related illnesses. *See Allegheny Gen. Hosp., supra; Laborers Local 17 Health &*

While a causal connection in general supports a finding of proximate cause, it is not sufficient by itself. *See Allegheny Gen. Hosp.*, 228 F.3d at 439. Here, the causal connection is itself weak, amounting to scarcely little more than an assertion that because the gun manufacturers distribute their products, they eventually fall into the wrong hands, are used to commit crimes against persons and property, "causing" the County to expend money for law enforcement. This factor tilts against the County.

### b. *Factor Two: Specific Intent to Harm*

The County has not alleged that the defendant firearm manufacturers, distributors, and retailers specifically intended to harm the County. Indeed, it hardly seems likely that a distant gun manufacturer would formulate its distribution policies with the goal of harming local governments such as Camden County. At most, plaintiff has alleged that defendants acted with reckless disregard for the consequences of their conduct. This allegation is not tantamount to intent to harm, thus this factor does not support a finding of proximate causation.

### c. *Factor Three: The Nature of the County's Injury*

In the antitrust context, this factor inquires whether the plaintiff's alleged injuries fall within the type of harm Congress sought to remedy by enacting the antitrust laws. *See Allegheny Gen. Hosp.* 228 F.3d at 439–40. Here, the Court inquires whether the type of injuries suffered by the County are consistent with the overarching purpose of New Jersey tort law "that wronged persons should be compensated for their injuries and that those responsible for the wrong should bear the cost of their tortious conduct." *People Benefit Fund v. Phillip Morris, Inc.*, 191 F.3d 229, 236 (2d Cir.1999), *cert. denied*, 528 U.S. 1080, 120 S.Ct. 799, 145 L.Ed.2d 673 (2000).

*Express Airlines v. Consolidated Rail Corp.*, 100 N.J. 246, 495 A.2d 107 (1985).

The County's direct injury theory includes allegations that the defendants' conduct has led to increased expenditures for municipal emergency services and law enforcement. The claimed injury is the increased cost of governmental services. If successful in proving these allegations, plaintiff will be entitled to compensation at the expense of the party allegedly causing the injury—the gun industry. The County's allegations in this case thus seem to fall within the ambit of New Jersey's policy of providing relief for those injured by tortfeasors' wrongful acts. On the other hand, the standing of New Jersey municipalities (including counties) to recover for tort damages is itself a questionable proposition, as discussed in the margin.[10] A

**10.** Defendants have argued that the County cannot recover the costs of tax-supported municipal services it provides as part of its governmental functions under New Jersey tort law, citing *City of Bridgeton v. B.P. Oil, Inc.*, 146 N.J.Super. 169, 369 A.2d 49 (Law Div. 1976) (barring recovery for fire department's response to oil spill), and *Township of Cherry Hill v. Conti Constr. Co.*, 218 N.J.Super. 348, 527 A.2d 921 (App.Div.1987) (no recovery of municipal costs following rupture of gas line during construction). No subsequent New Jersey case has addressed the issue. To the extent that each of these cases relied upon the former "fireman's rule" (precluding suit by a firefighter for injuries caused by a property owner's negligence) as a rationale, *see Cherry Hill*, 218 N.J.Super. at 349–50, 527 A.2d 921, these decisions are undermined by the New Jersey's decision to abolish the "fireman's rule" in 1994 to permit such recovery by police and firemen. *See* N.J.S.A. 2A:62A–21.

Meanwhile, other states have recognized a common law rule that public expenditures made in the performance of governmental functions are not recoverable absent legislative authorization, *see, e.g., Koch v. Consolidated Edison Co. of New York, Inc.*, 62 N.Y.2d 548, 468 N.E.2d 1, 8, 479 N.Y.S.2d 163 (1984) (increased costs for municipal police, fire, sanitation and hospital personnel resulting from power blackout); *District of Columbia v. Air Florida, Inc.*, 750 F.2d 1077, 1080 (D.C.Cir.1984) (no recovery of municipal costs incurred in responding to airplane crash); *Pittsburgh v. Equitable Gas Co.*, 98 Pa.Cmwlth. 523, 512 A.2d 83 (1986) (no recovery of municipal costs resulting from natural gas line explosion); *County of San Luis Obispo v. Abalone Alliance*, 178 Cal.App.3d 848, 858–59, 223 Cal.Rptr. 846, 850–51 (1986) (no recovery of costs incurred in response to intentional blockade of construction site). The rationale for this common law rule precluding municipal cost recovery derives from the public policy that costs of governmental services are borne by taxpayers and not parceled out in billing statements sent to those whose negligence made the services necessary. Justice (then-Judge) Kennedy, writing for the Ninth Circuit applying Arizona law, expressed the policy thus:

> [W]e conclude that the cost of public services for the protection from fire or safety hazards is to be borne by the public as a whole, not assessed against the tortfeasor whose negligence creates the need for the service. Where such services are provided by the government and the costs are spread by taxes, the tortfeasor does not expect a demand for reimbursement.

*Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.*, 719 F.2d 322, 323 (9th Cir.1983).

The *Flagstaff* case itself disclaimed holding that governmental entities could never recover the costs of their services, *id.* at 324, and further delineated an exception to the common law rule to permit recovery in public nuisance cases, *i.e.*, "where the acts of a private party create a public nuisance which the government seeks to abate." *Id.* This Court agrees that for abatement of a public nuisance, New Jersey law permits cost recovery, *see, e.g. State of New Jersey, Dep't of Environmental Protection v. Gloucester Environmental Management Services*, 821 F.Supp. 999, 1012–13 (D.N.J.1993) ("*GEMS Landfill* "). For acts of negligence, on the other hand, New Jersey's law is unclear.

Where the New Jersey Supreme Court has not spoken to this question, this federal court, sitting in diversity jurisdiction, may predict what New Jersey's highest court would hold. *See Hakimoglu v. Trump Taj Mahal Assoc.*, 876 F.Supp. 625, 629 (D.N.J.1994), *aff'd*, 70 F.3d 291 (3d Cir.1995). It suffices for present purposes to say that New Jersey's courts to date have not recognized a municipality's right to recover monetary damages caused by a tortfeasor's negligence. The Legislature's repeal of the "fireman's rule," N.J.S.A. 2A:62A–21, *supra*, may signify a willingness to depart from the common law rule with respect to personal injuries caused to governmental personnel due to the negligent or intentional torts of others. The logical path does not lead to the conclusion that general governmental costs also are recoverable from tortfeasors under New Jersey law. In short, for purposes of assessing the nature of the

recovery in tort for general costs of government, where the government's personnel and property have not themselves been injured, is probably not the type of harm sought to be remedied by New Jersey tort law. The unusual nature of the harm alleged thus also is a factor tilting against plaintiff's theory of proximate causation.

### d. *Factor Four: Directness/Indirectness of Injury*

The inquiry into directness or indirectness of the injury involves two inquiries: (1) the appropriate party, and (2) remoteness. *See Allegheny Gen. Hosp.* 228 F.3d at 440–41. The appropriate party requirement asks whether other, more directly injured parties could better pursue the relief sought by the plaintiff. *See id.* (citing *Steamfitters*, 171 F.3d at 927). Specifically, the Court must determine whether there exists an identifiable class of persons whose self-interest would normally motivate them to seek the relief sought by the County. *See id.* Here, the plaintiff posits that it has the exclusive power to sue for the relief it seeks—the costs of increased municipal services. The Court finds it unlikely that another party would be better situated to sue for such relief, and thus the County is indeed the appropriate party. Although this element favors the plaintiff, the remoteness element does not.

Turning to consider the remoteness element, the Court first examines the County's allegations of direct harm. The County has alleged that it suffered harm independent of the injuries to its citizens. The Second Amended Complaint states that as a result of the defendants' reckless marketing practices, the County is obliged to spend significant resources to deal with gun violence related problems. Specifically, plaintiff alleges that as a direct consequence of the flood of illegal firearms coming in to Camden County, it must consistently pay more out of the County budget for, among other things, additional

prosecutors, police, sheriffs, and County morgue personnel. The County argues that these added costs accrue regardless of whether a County resident or visitor is actually harmed. For example, the County contends that, due to the costs of administering the criminal justice system, it incurs substantial costs even without a single shot being fired.

The defendants argue that this case is like several recent decisions addressing lawsuits where plaintiff pension funds and hospitals sued the tobacco industry to recover excess monies allocated to cover the smoking-related health care costs of its members. In all of those cases, the courts held that the funds' damages flowed solely from harm from individual smokers, and thus the damages to the fund were too indirect and remote to support proximate causation. *See Allegheny Gen. Hosp.*, 228 F.3d at 442–43; *Laborers Local 17 Health & Benefit Fund*, 191 F.3d at 236; *Steamfitters*, 171 F.3d at 913. *Cf. Loeb v. Eastman Kodak Co.*, 183 F. 704 (3d Cir.1910) (limiting use of antitrust laws to plaintiffs who allege direct harm rather than those who allege derivative harm to stock holdings).

As Chief Judge Becker made clear in *Steamfitters*, in the tobacco/benefit fund cases the damages claimed by the benefit funds were entirely derivative of the injuries the plans' constituents suffered from smoking-related illnesses. *Steamfitters*, 171 F.3d at 927. Although the plans tried to frame their injuries as independent of the harm suffered by their smoking constituents, the court found that the injuries alleged were too derivative of the harm to plan members to be truly direct. This was so even though the plans suffered demonstrable and quantifiable harm, through payment of medical benefits for members' smoking illness-related health care. The plans could only be harmed if and when its members fell sick, leading to increased expenditures and increased costs of opera-

---

County's injury, the harm to taxpayers caused by negligence of a private tortfeasor has not

been shown to be the type of injury normally compensable under New Jersey tort law.

tion. There was no independent harm to the plans. Thus, without injury to the smokers, there was no injury to the funds, and the plaintiff failed to allege that it had suffered direct injury. *Id.*

In its most recent decision using the proximate cause factors employed in *Steamfitters*, the Third Circuit in *Allegheny Gen. Hosp.* upheld a district court's Rule 12(b)(6) dismissal of the claims of a group of hospitals who provided indigent care and alleged that their alleged injuries—increased expenditures due to smoking related illnesses—were directly caused by the actions of the tobacco industry. *Allegheny Gen. Hosp.*, 228 F.3d at 440–41. The court noted that—even though they provided direct care to those suffering from tobacco-related illnesses—the hospitals never actually contracted with or dealt with the defendants. *Id.* The court concluded that even though they arguably suffered increased costs as a result of their patients' smoking-related illnesses, the hospitals' injuries *still* were derivative of harm to third parties. Ultimately, in *Allegheny Gen. Hosp.*, the plaintiffs' direct injury arguments were undercut by the sheer number of links in the causal chain between the defendants' actions and the hospitals' harm.

The plaintiff's claims in this case are even more remote than those of the plaintiffs in *Allegheny Gen. Hosp.* The causal chain begins with the defendants' allegedly negligent and/or reckless failure to safely monitor the marketing and distribution of their products. The next step in the chain necessarily includes wrongful conduct on the part of distributors and/or retailers who sell guns to straw purchasers, and to criminals or other individuals forbidden by law from possessing firearms. The third and final step in the chain is the conduct of the end users. Because the County here has alleged that its harm arises from expenditures associated with the prevention and punishment of *criminal* misuse of firearms, this third and final link in the causal chain necessarily involves independent criminal conduct, and thus further stretches the causal connection between the initial alleged wrongdoing and the plaintiff's injury. The presence of multiple links in the causal chain in this case adds to the remoteness of plaintiff's injuries.

The derivative nature of plaintiff's claims also militates against a finding of proximate cause. The County argues that it incurs expenses even when no other person is injured, citing as examples (1) its costs for law enforcement where a shooting occurs but no other person is injured, and (2) its revenue losses caused by instances of illegal gun possession and criminal misuse of firearms. Even though the County has thus alleged that it is forced to expend additional funds to combat gun crimes, the difficulty lies in trying to distinguish between expenditures made in response to incidents where victims were actually shot (which expenditures are necessarily derivative), and those made in response to incidents where no other person is injured. Indeed, this type of injury may never be ascertainable. Generally, when the County responds to a gun situation, the weapon at issue is unknown, as is the manufacturer's connection to the circumstance. Similarly, the county incurs costs of law enforcement, crime prevention and the like due to the existence of firearms in society, whether or not the manufacturers have lacked due care in monitoring distribution channels. How can the normal and expected costs of such law enforcement be separated from those costs that accrue due to the negligent acts of these defendants? Thus, even granting plaintiff every reasonable inference, the County's theory of the case mixes derivative and independent injuries. The difficulty in ascertaining what share of the County's alleged injuries in this case are derivative of harm to others—and thus indirect—as well as the unknowability of what sort of weapon gave rise to some non-injury gun situation, tilt this factor in favor of dismissal.

e. *Factor Five: Highly Speculative Damages*

It is manifest in this case that the County's asserted damages are speculative and difficult to measure. In order to calculate damages, the County would have to refine a confusing mass of information concerning the damaging effects of defendants' alleged wrongful conduct. For instance, the County would have to demonstrate the extent to which criminal misuse of firearms would have been reduced with proper policies in place, how many fewer illegal firearms would have entered the County in light of those policies, and the savings the County would have realized had the defendants had in place better distribution policies. *Cf. Allegheny Gen. Hosp.*, 228 F.3d at 441–42 (quoting *Steamfitters*, 171 F.3d at 928–29).

Moreover, the County would face considerable difficulty in proving that its alleged injuries were caused by illegal handguns, as opposed to other factors such as a concurrent rise in drug use or the spiraling increase in legal weapons lawfully owned but illegally used. The Second Amended Complaint provides no guidance as to how plaintiff will achieve this balance, and thus the Court finds that it would be extraordinarily difficult for the County to isolate its injuries caused by the defendants' alleged misconduct as opposed to other supervening factors. Because of the overtly speculative nature of the County's asserted injuries, the Court finds that this factor also tilts against a finding of proximate causation.[11]

f. *Factor Six: Avoiding Trial Complexity*

The final *AGC* factor is whether the plaintiff's claims are judicially manageable in terms of avoiding duplicate recoveries and complex apportionment. While there does not appear to be a risk of duplicative recoveries in this case, there is a strong likelihood that a trial would involve exceedingly complex apportionment of liability. For reasons now discussed, the Court finds that any effort to compensate the County for its alleged injuries in this case would require the expenditure of enormous judicial resources simply to determine which defendants should bear what percentage of any liability.

The County's factual allegations are noticeably vague as to who is actually responsible for the alleged wrongdoing in this case. Although the Court has throughout this Opinion referred generally to the "defendants" or the "gun industry," there are important distinctions between the individual groups of defendants. The County has aimed the same allegations at all of the defendants without delineating the specific roles they played in harming the County, but a trial would require a parsing of the complaint according to the defendants' market function.

Although the County generally alleges that the defendants' conduct helped lead to the creation of the criminal market for handguns, there are important distinctions among the individual defendants' alleged contribution to this criminal market. The named defendants are gun manufacturers, who the County alleges should have better enforced policies designed to prevent the eventual distribution and sale of guns to criminals. Other (unnamed) defendants are distributors, who allegedly were irresponsible in failing to refrain from distributing guns to retailers with a record of selling guns to criminals. Still other defendants (also unnamed) are retailers, who allegedly more directly place guns into the hands of criminals.

The rough groupings of defendants described above show that the County's theory of negligence as against each group necessarily depends upon what role the individual defendant plays in selling guns. Obviously, a local retailer who sells guns to criminals contributes to a municipality's

---

**11.** Furthermore, neither aggregated nor statistical evidence would suffice to overcome the speculative nature of the County's alleged injuries. *See Steamfitters*, 171 F.3d at 929.

harm in a different way than does a manufacturer, especially one which does not know whether its guns ended up in criminal hands by accident, or because of the conduct of its distributors or its retailers. Assuming that the County succeeded at trial in showing that the defendants' conduct was a cause in fact of the County's alleged injuries, the plaintiff would still be required to show, *inter alia,* (1) whether each brand/type of firearm was a substantial factor in causing the County's alleged injuries, (2) whether manufacturers, distributors, or dealers bear a different degree of responsibility for the County's harm, and (3) whether intervening factors such as the theft of guns from retailers and/or legitimate users cuts the chain of causation. Because of the logistical problems involved in apportioning damages between the very distinct groups of defendants in this case, the Court finds that this final factor also tilts against a finding of proximate cause.

### g. *Summary of Proximate Cause*

The County, at most, has thus met only two of the six *AGC* proximate cause factors. There is a weak and attenuated causal connection, and it is possible, but doubtful, that the County's claims are consistent with the general aims of New Jersey tort law. These two equivocal factors are outweighed by the sheer remoteness of the County's injuries. Remoteness is seen in the indirect nature of the County's alleged injuries, and in the great number of links in the chain of causation connecting the defendants' negligent conduct with the County's increased expenditures. Remoteness is also evident in the highly speculative nature of the damage claims and the exceedingly complex trial proofs that would be required to properly apportion damages among the various defendants.

As in the tobacco cases, "the tortured path one must follow from the [defendants'] alleged wrongdoing to the [County's] increased expenditures demonstrates that the plaintiff's claims are precisely the type of indirect claims the proximate cause requirement is intended to weed out." *Allegheny Gen. Hosp.,* 228 F.3d at 443 (quoting *Steamfitters,* 171 F.3d at 930). In sum, proximate cause is lacking, and this deficiency deprives the County of standing to assert its negligence-based claims.[12] It is important to note, however, that this Court's findings concerning proximate cause are limited to the factual allegations in this case. This Opinion should not be read as holding that a municipality will *never* succeed in pleading proximate cause in a case such as this. Instead, this Court finds only that, based on the factors outlined above, the Second Amended Complaint does not contain a legally plausible basis for asserting that the defendants' alleged wrongdoing proximately caused the County's claimed injuries.

For the foregoing reasons, plaintiff's negligence-based causes of action will be dismissed for failure to state a claim.

### F. *Public Nuisance Claim*

■ The County's remaining claim is for public nuisance, which does not require a showing of proximate cause. *Allegheny Gen. Hosp.,* 228 F.3d at 446. " 'A public nuisance is an unreasonable interference with a right common to the general public.' " *Id.* (citing *Philadelphia Elec. Co. v. Hercules, Inc.,* 762 F.2d 303, 315 (3d Cir. 1985) (quoting *Restatement (Second) of Torts* § 821B(1) (1979) (hereinafter "*Restatement* § . . .")))). A claim for public nuisance "may lie even though neither the plaintiff nor the defendant acts in the exercise of private property rights." *Philadelphia Electric Co.,* 762 F.2d at 315.

---

12. Because the Court has determined that the County has failed to meet the second prong of the standing analysis (whether the injury asserted can be fairly traced to the challenged action) we need not reach the third prong (whether the harm alleged is redressable by this Court).

In order to state an actionable claim for public nuisance, the plaintiff must allege that the defendant to some extent controlled the nuisance to be abated. Alternatively, the common law also holds liable those who participate "'to a substantial extent in carrying it on.'" *GEMS*, 821 F.Supp. at 1012 (quoting *Restatement* § 834).

### 1. Whether the County Has the Power to Sue in its Public Capacity to Abate a Public Nuisance

A threshold issue is whether the County has standing to bring an action for public nuisance against the firearms industry in order to abate the danger to its citizens' health and safety. As discussed above, public nuisance claims are typically brought by or on behalf of the state or an appropriate subdivision by the proper public authority. *Restatement* § 821C cmt. a. That the County appears as plaintiff in this action is entirely consistent with New Jersey's public nuisance jurisprudence. *GEMS*, 821 F.Supp. at 1012–13.

New Jersey has not enacted any laws preventing local governments from suing the gun industry. Moreover, the general empowering legislation for New Jersey's Counties broadly provides that Counties may sue and be sued. N.J.S.A. 40:18–3. The Court finds that the Counties' broad statutory power to sue, and the existence of legislation in other states precluding such suits, allow an inference to be drawn that until the New Jersey legislature provides otherwise, municipalities such as Camden County have general statutory and constitutional standing to sue in order to abate public nuisances.

### 2. Whether the Plaintiff's Public Nuisance Claim Should Be Dismissed Because it Requests Relief That Includes Governmental Costs

The Court next turns to consider whether the County may assert a claim for monetary relief in connection with its public nuisance claim. Defendants argue that the County's claim for damages is barred by the doctrine that public expenditures made in the performance of governmental functions are not recoverable.

As a preliminary matter, the rule against municipal cost recovery would not mandate dismissal of the County's entire public nuisance claim. Even if, as the defendants argue, this doctrine prevents the County from recovering expenditures made in combating the alleged flow of illegal handguns into Camden County, it would entail only a limit on the scope of damages that the County might recover. Plaintiff's request for injunctive and equitable relief would be unaffected by this doctrine. (*See* SAC ¶¶ 1–2.)

Moreover, for reasons discussed above in footnote 10, the Court questions the continued vitality of *Township of Cherry Hill* or *City of Bridgeton,* the New Jersey decisions defendants cite in support of the rule against municipal cost recovery. Even assuming, however, that New Jersey still follows the rule against municipal cost recovery in cases of negligence, this principle does not extend so far as to preclude the County from recovering on its public nuisance claims.

The leading case on the doctrine barring recovery of the cost of municipal services is *Flagstaff v. Atchison, Topeka & Santa Fe Ry. Co.,* 719 F.2d 322, 323 (9th Cir. 1983). In that case the Ninth Circuit, speaking through Justice (then Judge) Kennedy, noted an exception to the general rule against recovery of municipal costs where the acts of a private party create a public nuisance which the government seeks to abate. *Id.* Thus, *Flagstaff* supports the proposition that municipal cost recovery may be appropriate in public nuisance abatement actions brought by a governmental plaintiff.

The Court also finds that precedent from within this Circuit provides further support for the notion that the municipal cost rule does not bar damages claims in public nuisance actions. The Third Circuit

has stated that plaintiffs asserting claims for municipal services due to unusual accidents should be allowed to prove their damages associated with lost production by municipal workers. *See Com. of Pa. v. General Public Utilities Corp.*, 710 F.2d 117, 122–23 (3d Cir.1983), *aff'g in part, vacating in part sub nom. In re TMI Litigation Governmental Entities Claims*, 544 F.Supp. 853, 855 (M.D.Pa.1982) (summary judgment not appropriate where there is disputed factual question whether "nuclear incidents" present a unique type of hazard). The Third Circuit thus has counseled that a municipality *may*, under the appropriate circumstances, sue for the cost of public services spent in connection with nuisance abatement. *Id.*

In sum, even to the extent that New Jersey still embraces the doctrine against recovery of municipal services, this principle does not sweep so broadly as to prevent the County from recovering damages in connection with its public nuisance claims. *Accord White v. Smith & Wesson*, 97 F.Supp.2d at 824; *Boston v. Smith & Wesson*, Civ. No.1999–02590, Slip Op. at 18, 2000 WL 1473568 at *8 (Mass.Super.Ct. July 13, 2000) (rejecting assertion of doctrinal bar to city's claim for cost recovery). *But see Cincinnati v. Beretta*, Nos. C–990729, C–990814, C–990815, Slip Op. at 25, 2000 WL 1133078 at *10 (Ohio App. Aug. 11, 2000).

### 3. *Analysis*

■ Despite the County's standing to bring an action for abatement of a public nuisance, and despite the Court's finding that the rule against municipal cost recovery does not bar the County from recovering damages on this claim, the County's public nuisance claim suffers from the fatal defect of failing to allege the required element that the defendants exercised control over the nuisance to be abated.

The County alleges that the nuisance to be abated in this case is the criminal market for handguns in Camden County, and that the defendants created this nuisance by implementing marketing and distribution policies that make it easy for criminals to access guns. (*See* Tr. of Oral Arg. May 15, 2000 at 48:7–24.) Thus, the County has theorized that the wrongful conduct to be abated is the making and carrying out of marketing and distribution policies. The physical location of this conduct is on the premises of the manufacturer defendants, which operate in several states and at least two foreign nations. No manufacturer is even located in New Jersey. Under the County's public nuisance theory, then, the defendants' wrongful conduct sought to be abated transpires in locations far from the streets of Camden, where an alleged criminal market for handguns is the end result.

Moreover, it is evident that the defendants' allegedly wrongful conduct in this case could *never* ripen into a public nuisance absent the conduct of third parties. Even assuming that the manufacturers have promulgated lax distribution policies, these policies would not lead to a general threat to the health and safety of Camden citizens without the acts of third parties, *i.e.*, criminals. Even given a most generous reading, the Second Amended Complaint cannot be understood to allege that the defendants' distribution and marketing policies, standing on their own, cause harm absent criminal conduct.

■ Having determined that the defendants' conduct would never amount to a public nuisance in Camden County without additional third party conduct, the question then becomes whether the defendants should have anticipated this conduct and tried to prevent it. As the Third Circuit has recognized, defendants have no duty to control the misconduct of third parties. *Arcadian*, 189 F.3d 305. The control requirement applies with equal force to public nuisance claims. While the *Restatement* "holds liable not only those who carry on an activity, but those who participate 'to a substantial extent in carrying it on,' " *GEMS*, 821 F.Supp. at 1012 (quoting *Restatement* § 834), the defendant must have a tangible role in creating

and carrying out the nuisance. *See id.* (citing *Restatement* § 427B). Where the acts of independent, third parties are the cause of the nuisance, parties that have neither controlled nor created the nuisance should not be held responsible. *See New Jersey Department of Envt'l Prot. v. Exxon Corp.*, 151 N.J.Super. 464, 484, 376 A.2d 1339 (Ch.Div.1977). The County in this case has not alleged that the defendants endorsed or condoned the alleged end result of their marketing policies, which is the criminal gun market in Camden. Without an allegation that the defendants' allegedly wrongful conduct is linked to the Camden County by further control or substantial participation in the creation of a criminal market for guns, there simply is not a sufficient nexus between the defendants' conduct and the alleged injury to the government and citizens of Camden County.

The County has not alleged that the defendants violated any laws or regulations related to the distribution of handguns, nor has the County alleged that the defendants engaged in the sort of ultrahazardous activity that would lead to the imposition of strict liability. Although the threat of gun violence is very real, the County simply may not bypass the requirement that the defendant in a public nuisance action must be shown to have controlled or participated to a substantial extent in the nuisance. Because the County here has failed to state a viable theory for linking the defendants with the criminal acts that constitute the end harm, the Court concludes that plaintiff's public nuisance claim must be dismissed.

In sum, the County has sought to extend the limits of public nuisance law so far as to eliminate the requirement that the defendants control or participate in the harm to be abated. Because under the allegations of the Second Amended Complaint the defendants are only remotely connected to the events which actually harmed Camden County's citizens, there is not a legal basis for imposing public nuisance liability. While the Court does not fault the County for seeking new and creative methods of combating gun related violence within its borders, public nuisance law does not sweep so broadly as to impose liability on manufacturers of a legal product, who follow relevant regulations, and who do not control or participate in irresponsible secondary and tertiary acts that are more directly responsible for the end harm. Such an extension of common law public nuisance would be particularly hazardous in an area, such as firearms control, where Congress and the state legislatures have worked to establish socially acceptable regulations of these dangerous products. *Cf. Philadelphia Elec. Co.*, 762 F.2d at 315 (stressing hazards of extending public nuisance law into heavily regulated field of environmental pollution). Accordingly, the Court concludes that the County has not stated an actionable claim of public nuisance under New Jersey.

## IV. *CONCLUSION*

The national impact of handgun violence has made the prospect of municipalities suing gun industry a highly controversial and politically charged issue. However, the question before the Court is not whether the gun industry is immoral or reckless, nor whether good citizenship requires manufacturers to actively curtail streams of distribution that eventually appear more likely than others to lead to illegal gun use. The true question for this Court is whether Camden County has in its Second Amended Complaint stated legally actionable claims. As discussed above, the Court concludes that it has not. Accordingly, the defendants' motion to dismiss must be granted and the County's claims in this case will be dismissed.

The accompanying Order is entered.

## *ORDER*

THIS MATTER having come before the

**268**

Court on the motion of named defendants [1] to dismiss plaintiff's Second Amended Complaint pursuant to Rule 12(b)(6), Fed. R.Civ.P., for failure to state a claim upon which relief may be granted, and the Court having considered the submissions of the parties, and having heard oral argument on this matter on December 17, 1999 and on May 15, 2000, and for the reasons stated in the Opinion of today's date;

**IT IS** this 5th day of December, 2000 hereby

**ORDERED** that defendants' motion to dismiss is **GRANTED** and plaintiff's Second Amended Complaint is **DISMISSED.**

---

1. This motion was brought on behalf of the following defendants: Beretta U.S.A.; Browning Arms; Bryco Arms; Colt's Manufacturing; Glock; Hi–Point; H & R 1871; Navegar; Phoenix Arms; Smith & Wesson; and Sturm, Ruger & Co.