[Nos. A103211, A105309. First Dist., Div. One. Feb. 10, 2005.]

In re FIREARM CASES.[*]

---

[*] *People v. Arcadia Machine & Tool, Inc.* (Super. Ct. L.A. County, 2003, No. BC210894); *People v. Arcadia Machine & Tool, Inc.* (Super. Ct. S. F. City and County, 1999, No. 303753); *People ex rel. County of L. A. v. Arcadia Machine & Tool* (Super. Ct. Los Angeles County, 1999, No. BC214794).

960

964

COUNSEL

Lerach Coughlin Stoia Geller Rudman & Robbins, William S. Lerach, Frank J. Janecek, Jr., Michael J. Dowd, Jonah H. Goldstein, Patrick J. Coughlin, Ex Kano Sams II, Jason T. Baker; Rockard J. Delgadillo, City Attorney (Los Angeles), Don Kass, Deputy City Attorney; Brady Center to Prevent Gun Violence, Dennis A. Henigan, Brian J. Siebel, Daniel R. Vice; Lieff, Cabraser, Heimann & Bernstein, Robert J. Nelson, Richard M. Franco; Educational Fund to Stop Gun Violence, Michael Jenkins, Sayre Weaver; Dennis J. Herrera, City Attorney (San Fransisco), Owen J. Clements, Chief of Special Litigation, Kristine A. Poplawski and Ingrid M. Evans, Deputy City Attorneys; Lloyd W. Pellman, County Counsel (Los Angeles), Lawrence Lee Hafetz and Judy W. Whitehurst, Deputy County Counsel; Samuel L. Jackson, City Attorney (Sacramento), Gustavo L. Martinez, Deputy City Attorney; Manuela Albuquerque, City Attorney (Berkeley), Matthew J. Orebic, Deputy City Attorney; Thomas F. Casey III, County Counsel (San Mateo), Brenda B. Carlson, Deputy County Counsel; Richard E. Winnie, County Counsel (Alameda), Rose Kwiatkowski, Assistant County Counsel; John A. Russo, City Attorney (Oakland), Randolph W. Hall, Assistant City Attorney, J. Patrick Tang, Deputy City Attorney; Thompson, Lawson, Michael S. Lawson; Legrand H. Clegg II, City Attorney (Compton); Celia Francisco, Deputy City Attorney; and Emmerline Foote, Interim City Attorney (Inglewood) for Plaintiff and Appellant The People ex rel. Rockard J. Delgadillo as City Attorney et al.

Gordon, Feinblatt, Rothman, Hoffberger & Hollander, Lawrence S. Greenwald, Catherine A. Bledsoe, Cynthia A. Shay, Margaret W. Tindall; Livingston Law Firm, Craig A. Livingston and Kymberly E. Speer for Defendants and Respondents Beretta U.S.A. Corp. and Fabbrica D'Armi Pietro Beretta S.p.A.

Koletsky, Mancini, Feldman & Morrow, Roy A. Koletsky, Susan L. Caldwell and Douglas E. Kliever for Defendants and Respondents National Shooting Sports Foundation, Inc., and Sporting Arms and Ammunition Manufacturers' Institute, Inc.

Wildman, Harrold, Allen & Dixon, James P. Dorr, James B. Vogts, Sarah L. Olson, Aimee B. Anderson; Luce, Forward, Hamilton & Scripps, Lawrence J. Kouns and Richard R. Spirra for Defendant and Respondent Strum, Ruger & Company.

Trutanich-Michel and C. D. Michel for Defendants and Respondents B&B Group, Inc., and S.G. Distributing Co.

Haight, Brown & Bonesteel, Denis J. Moriarty, Friday, Eldredge & Clark, William M. Griffen III and Jonann E. Coniglio for Defendant and Respondent Browning Arms Company.

Murchison & Cumming and Friedrich W. Seitz for Defendant and Respondent Carl Walther GmbH.

Wright & L'Estrange, Robert C. Wright, Laurie E. Barber; Jones Day and Thomas E. Fennel for Defendant and Respondent Colt's Manufacturing Company, Inc.

Drinker Biddle & Reath and Alan J. Lazarus for Defendant and Respondent Ellett Brothers, Inc.

Law Offices of Steven A. Silver and Steven A. Silver for Defendant and Respondent Excel Industries, Inc.

Haight, Brown & Bonesteel, Denis J. Moriarty; Renzulli, Pisciotti & Renzulli and John F. Renzulli for Defendants and Respondents Glock, Inc., Hi-Point Firearms, H&R 1871, Inc., and Kel-Tec CNC Industries, Inc.

Holland & Knight and Charles L. Coleman III for Defendant and Respondent Heckler & Koch, Inc.

Selman Breitman and Raymond J. Liddy for Defendant and Respondent International Armament Corporation.

Gorry, Meyer & Rudd, Christopher L. Rudd, Frank Sandelmann and Jon-Jamison Hill for Defendant and Respondent National Gun Sales.

Gladych & Associates and John A. Gladych for Defendant and Respondent North American Arms, Inc.

Haight, Brown & Bonesteel, Denis J. Moriarty; Tarics & Branisa and Michael J. Zomcik for Defendant and Respondent Phoenix Arms.

Sedgwick, Detert, Moran & Arnold and Wayne A. Wolff for Defendant and Respondent RSR Wholesale Guns, Inc.

Wilson, Elser, Moskowitz, Edelman & Dicker, Robert M. Anderson and Robert L. Joyce for Defendant and Respondent Sigarms, Inc.

Allen Matkins Leck Gamble & Mallory, George J. Berger; Shook, Hardy & Bacon and Jeffrey S. Nelson for Defendant and Respondent Smith & Wesson Corp.

Haight, Brown & Bonesteel, Denis J. Moriarty; Budd, Larner, Timothy A. Bumann and Bridgette E. Eckerson for Defendant and Respondent Taurus International Manufacturing Inc., and Forjas Taurus S.A.

Harvey M. Grossman; Dechert and James M. Beck for Product Liability Council, Inc., as Amicus Curiae on behalf of Defendant and Respondent Manufacturers.

Hugh F. Young, Jr., for Product Liability Advisory Council, Inc., as Amicus Curiae on behalf of Defendant and Respondent Manufacturers.

**OPINION**

**MARCHIANO, P. J.**—A number of California cities and counties filed an action on behalf of the general public against manufacturers, distributors and retailers of handguns and their trade associations, asserting that their conduct of distributing firearms in a manner that enables criminals to acquire the firearms constituted a public nuisance and a pattern of unlawful, unfair and deceptive business acts and practices in violation of the unfair competition law (UCL), Business and Professions Code sections 17200 and 17500.[1] On March 7, 2003, the superior court considered several separate dispositive motions. It granted judgment on the omnibus motion for summary judgment brought by various gun manufacturers, distributors and trade associations.[2] Plaintiffs appealed. We affirm because of plaintiffs' failure to establish a causal connection between the alleged unfair practices and the harm, as we explain below.

## BACKGROUND

In 1999, the city attorneys of several jurisdictions, including the Cities of San Francisco, Berkeley, Sacramento, and the Counties of San Mateo and Alameda, filed an unfair business practices and nuisance action on behalf of the general public in San Francisco Superior Court against a large number of manufacturers and distributors of handguns and three trade associations, alleging that the defendants marketed and distributed handguns in violation of

---

[1] Except where otherwise indicated, all statutory references are to the Business and Professions Code.

[2] Other defendants, including retailers Traders Sports, Inc., MKS Supply, Inc., Southern Ohio Gun Distributors, Inc. and Andrew's Sporting Goods, settled according to the terms of consent decrees or stipulated judgments entered after summary judgment was denied as to those defendants. Ellett Brothers, Inc. entered into a stipulated judgment that purported to be a final judgment as to issues raised in a summary adjudication motion. The purported appeal from that stipulated judgment will be dismissed as having been taken from a nonappealable order.

the UCL.[3] (*People v. Arcadia Machine & Tool, Inc.* (Super. Ct. S.F. City and County, 1999, No. 303753).) In the same year, the city attorneys of Los Angeles, Compton, Inglewood, West Hollywood and the mayors of the cities of Inglewood and West Hollywood filed a similar action in Los Angeles Superior Court. (*People v. Arcadia Machine & Tool et al.* (Super. Ct. L. A. County, 1999, No. BC210894).)[4] Later that year, the County of Los Angeles and three county supervisors filed a third similar action in Los Angeles County Superior Court.[5] (*People ex rel. County of Los Angeles v. Arcadia Machine & Tool* (Super. Ct. L. A. County, 1999, No. BC214794).) The complaints sought declaratory and injunctive relief, disgorgement, restitution and civil penalties.

In February of 2000, the Superior Court of San Diego County granted a petition for coordination. The coordinated cases were combined in Judicial Council Coordination Proceeding No. 4095, entitled "Firearm Cases" and assigned to the superior court in San Diego. This appellate district was designated as the reviewing court with appellate jurisdiction.

The complaints in the three coordinated actions generally alleged that the defendants market, distribute, promote and design handguns in a manner that facilitates the use of the weapons to commit violent crime, fails to incorporate safety features, deceives the public about the dangers of firearms, circumvents federal, state and local laws and creates a public nuisance. Plaintiffs characterized their case as one that sought civil penalties and injunctive relief for the selling of guns to retail dealers that supplied the illegal black market with firearms. Plaintiffs contended that they possessed evidence showing that each

---

[3] The named defendants were: Arcadia Machine & Tool, Inc.; Bryco Arms, Inc.; Davis Industries, Inc.; Excel Industries, Inc.; Lorcin Engineering Co., Inc.; China North Industries; Phoenix Arms; Sundance Industries, Inc.; Beretta U.S.A. Corp.; Pietro Beretta S.p.A.; Browning Arms Co.; Carl Walther GmbH; Charter Arms, Inc.; Colt's Manufacturing Co., Inc.; Forjas Taurus, S.A.; Taurus International Manufacturing, Inc.; Glock, Inc.; Glock GmbH; H&R 1871, Inc.; Heckler & Koch, Inc.; Kel-Tec CNC Industries, Inc.; MKS Supply, Inc.; Navegar, Inc.; North American Arms, Inc.; Sigarms, Inc.; Smith and Wesson Corp.; S.W. Daniels, Inc.; Sturm Ruger & Company, Inc.; American Shooting Sports Council, Inc.; National Shooting Sports Foundation, Inc.; Sporting Arms and Ammunition Manufacturers' Institute, Inc.; B.L. Jennings, Inc.; Ellett Brothers, Inc.; International Armament Corp.; RSR Wholesale Guns, Inc.; Southern Ohio Gun Distributors; and Traders Sports, Inc.

[4] The Los Angeles City and County complaints added the following fictitious business names for the following entities: Accu-Tek for Excel Industries, Inc.; Hi-Point Firearms for MKS Supply, Inc.; Norinco for China North Industries; Intratec U.S.A., Inc. for Navegar, Inc.; Cobray Firearms, Inc. for S.W. Daniel, Inc.; and Interarms Industries, Inc. for International Armament Corp. Those complaints also added B&B Group, Inc., Andrew's Sporting Goods, Inc., National Guns Sales, Inc., S.G. Distributing, Inc., and Hawthorne Distributors, Inc.

[5] The Los Angeles County complaint also added Cobray Firearms, Inc. as a fictitious business name for S.W. Daniel, Inc.

defendant repeatedly sold its guns to "high-risk" retail dealers who were associated with large quantities of guns that were traced by law enforcement authorities as having been used in crimes.[6]

In early 2001, defendants moved for an order compelling the plaintiffs to disclose facts supporting their claims. On March 26, 2001, the court granted the request and ordered plaintiffs to disclose evidence reflecting how criminals and others acquired the firearms manufactured and/or sold by defendants and whether the manner of acquisition had a factual nexus to defendants' alleged conduct.

Following multiple disagreements over discovery matters, certain defendants, including Beretta U.S.A. Corp. and Sturm, Ruger & Company, Inc., moved for an order precluding evidence that defendants' conduct caused the acquisition of firearms by criminals. The preclusion request was based on plaintiffs' failure to produce documents to support their sales and distribution theories of liability. Plaintiffs responded that they were not required to link a specific instance to a particular defendant and proposed to prove their case with expert testimony based on statistical studies of illegal gun purchases. The court denied the motion, but noted that without access to the evidentiary foundation for expert testimony, the expert opinions would be nothing more than policy arguments.

Manufacturer, distributor and retailer defendants renewed their arguments in a summary judgment motion.[7] The motion was based on the arguments that plaintiffs could not establish a causal connection between defendants' business practices and the acquisition of firearms by criminals, and that expert opinion could not be substituted for evidence. Specifically, defendants' statement of undisputed facts consisted of 10 numbered statements contending that there was no evidence of any incident connecting a defendant with a shooting or a criminal's acquisition of a weapon through an improper purchase from a retail source.

---

[6] In the usual case, gun manufacturers do not sell directly to customers or retailers, but sell to licensed distributors or wholesalers, who then sell to licensed retailers. (See, e.g., Note, *California's Legislative Response to Merrill v. Navegar: An Analysis* (2003) 24 Whittier L.Rev. 833, 849.)

[7] The manufacturer defendants moving for summary judgment were: Sturm, Ruger & Company, Inc.; Beretta U.S.A. Corp; Fabbrica d'Armi Pietro Beretta S.p.A.; Kel-Tec CNC Industries, Inc.; Hi-Point Firearms; H&R 1871, Inc.; Glock, Inc.; Sigarms, Inc.; Taurus International Manufacturing, Inc.; Forjas Taurus S.A.; Phoenix Arms; Browning Arms Company; Excel Industries, Inc.; North American Arms, Inc.; Heckler & Koch, Inc.; Smith & Wesson Corp.; and Colt's Manufacturing Company. The moving distributor defendants were: RSR Wholesale Guns, Inc.; Ellett Brothers, Inc.; MKS Supply; Southern Ohio Gun Distributors; B&B Group, Inc.; S.G. Distributing Co.; Hawthorne Distributors; Carl Walther GmbH; and National Gun Sales. The trade association defendants joined in the omnibus summary judgment motion and filed their own motion for summary judgment.

Plaintiffs responded with a separate statement of 478 numbered items in 104 pages, and what the trial court characterized as "a mountain of argument" and "120 pounds of paper." The court noted that most of the purported evidence submitted by plaintiffs consisted of inadmissible hearsay studies, monographs and reports, but did not make specific evidentiary rulings.

On April 10, 2003, the trial court filed a carefully reasoned and thorough 45-page opinion granting the omnibus motion of the manufacturer and distributor defendants. The court examined plaintiffs' evidence and recognized that it showed only that there are some bad retailers whose actions facilitate the transfer of guns to criminals. The trial court discussed the standards predating the decision in *Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180 [83 Cal.Rptr.2d 548, 973 P.2d 527] (*Cel-Tech*), that plaintiffs urged were applicable. The court also noted the definition of "unfair competition" in *Cel-Tech,* and reasoned that under any test, there must be some causal connection between the harm and the conduct of the defendants.

The court deduced that the only connection between the high-risk gun sales practices and the gun manufacturers was their failure to police the entire gun industry. Absent some connection between any practice of the gun manufacturer defendants and the harm caused by illegal guns, the trial court found no unfairness could be shown. The court also stated that defendants' mere failure to implement changes in their business practices does not establish a UCL violation or a public nuisance.

In addition, the court also granted summary judgment for the trade association defendants, finding no authority for the argument that a trade association had a duty to adopt firearms safety standards or that the failure to do so was connected to harm to the public.

The court denied summary judgment to distributor defendants Ellett Brothers, Inc., MKS Supply, Inc., and Southern Ohio Gun Distributors, stating that they failed to negate plaintiffs' evidence that they violated state law by distributing firearms to purchasers without receiving documentation of the purchasers' possession of state and local firearms dealer licenses. The court also denied summary judgment to retailer defendants Andrew's Sporting Goods, Inc. (Andrew's), and Trader's Sports, Inc. (Trader's), because the evidence, in the form of gun trace data, raised questions of fact concerning involvement in high-risk business practices.[8]

---

[8] Data showed that Andrew's had 200 guns per year traced to crimes. It also had short *time-to-crime* indicators and 1,037 known multiple sales involving 2,192 guns between 1995–1999, repeated failures to account for the disposition of firearms, and setting up an entire inventory account in the name of another store for firearms that were missing. Andrew's was

Judgment was entered dismissing manufacturer, distributor and trade association defendants according to the summary judgment orders.[9] Plaintiffs filed a timely notice of appeal.

## DISCUSSION

We are aware of the toll taken on society by firearm violence and the improper acquisition and use of firearms.[10] One article described the gravity of the problem as follows. "Firearm violence is a major public health problem in the United States. In 2000, firearms were used in 10,801 homicides—two-thirds of all homicides in the U.S.—and 533,470 non-fatal criminal victimizations including rapes, robberies, and assaults." (Vernick et al., *Symposium: Emerging Issue in Population Health: National and Global Perspective* (2003) 31 J.L. Med. & Ethics 567, fns. omitted.) The impact reaches beyond the families grieving in their communities. "The social costs of gun violence in the United States are also staggering, and have been estimated to be on the order of $100 billion per year." (*Ibid.*; see also Cook & Ludwig, *Public Policy Perspectives Principles for Effective Gun Policy* (2004) 73 Fordham L.Rev. 589, 593 (*Public Policy Perspectives*).) Commentators debate the appropriate allocation of responsibility for restricting illegal firearms acquisition. (Compare e.g., Eggen et al., *Gun Torts: Defining a Cause of Action for Victims in Suits Against Gun Manufacturers* (2002) 81 N.C. L.Rev. 115, [advocating imposing tort liability on gun manufacturers], with McCoskey, *The Right of the People to Keep and Bear Arms Shall Not Be Litigated Away: Constitutional Implications to Municipal Lawsuits Against the Gun Industry* (2002) 77 Ind. L.J. 873, 877 [arguing that litigation against gun manufacturers usurps the regulatory role of the legislature]; see also Kennedy, *Gunshows and the Illegal Diversion of Firearms* (2000) 6 Geo. Pub.Pol'y.Rev. 7, 10–11

repeatedly cited by the United States Department of Treasury, Bureau of Alcohol, Tobacco and Firearms (ATF) for violating federal law governing record keeping. Evidence linking distributor SG Distributing, Inc. to Andrew's demonstrated wrongdoing was labeled "particularly striking" because the same individual owned both Andrew's and SG Distributing, Inc. Trader's was also linked to "overwhelming indicators of gun trafficking."

[9] The judgment listed the following defendants as being dismissed with prejudice: B&B Group, Inc.; Beretta U.S.A. Corp.; Browning Arms Company; Carl Walther GmbH; Colt's Manufacturing Company; Excel Industries, Inc.; Fabbrica d'Armi Pietro Beretta S.p.A.; Forjas Taurus S.A.; Glock, Inc.; H&R 1871, Inc.; Heckler & Koch, Inc.; Hi-Point Firearms; International Armament Corporation a fictitious business name for Interarms Industries, Inc.; Kel-Tec CNC Industries, Inc.; National Gun Sales; National Shooting Sports Foundation, Inc.; North American Arms, Inc.; Phoenix Arms; RSR Wholesale Guns, Inc.; S.G. Distributing Co.; Sigarms, Inc.; Smith & Wesson Corp.; Sporting Arms and Ammunition Manufacturers' Institute, Inc.; Sturm, Ruger & Company, Inc.; and Taurus International Manufacturing, Inc.

[10] The United States Department of Justice, Bureau of Justice Statistics, Firearms and Crime Statistics report that in 2003, 449,150 victims of violent crimes stated that they faced an offender with a firearm and that 67 percent of the 16,503 murders in 2003 were committed with firearms. (<http://www.ojp.usdoj.gov/bjs/guns.html> (as of Feb. 10, 2005).)

[citing academic debate and competing statistics regarding whether criminals obtain firearms primarily through theft or through retail sources].)

Plaintiffs in this case seek to hold the gun manufacturer and distributor defendants liable, not for any wrongful or illegal action taken by them, but for failing to take proactive steps to control the practices of a small percentage of the federal firearms licensees (FFL) that they ultimately supply. These few FFL's to whom the gun distributors supply firearms have allegedly engaged in various business practices that experts state are associated with a high risk that guns will be diverted to criminals. After considering the voluminous expert studies and declarations submitted in opposition to the defendants' motion for summary judgment, the trial court found that the evidence did not support the basic theory of plaintiffs' case.

Plaintiffs' legal theory of expanding UCL liability to those who profit from downstream dealer sale of guns that end up in criminal hands is creative and thought provoking. But based on the evidence presented, we conclude that endorsing the theory in this case would stretch the already expansive boundaries of the UCL beyond any principled reading of the statute. In addition, supervision of the sweeping measures sought would be a herculean task for court oversight.[11]

*Summary Judgment Proceedings*

■ "[G]enerally, the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 [107 Cal.Rptr.2d 841, 24 P.3d 493].) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Ibid.*) ■ We review the trial court's decision de novo. (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 67–68 [99 Cal.Rptr.2d 316, 5 P.3d 874].)

■ Generally we use the same three-step analysis employed by the trial court. "The three steps are (1) identifying the issues framed by the pleadings,

---

[11] Plaintiffs' list of a number of suggested practices that defendants could undertake highlights the problems of administering such a program. The suggested practices include: collecting and using crime gun tracing data to identify high-risk retailers; selling only to approved dealers; providing training to retailers about how to block straw man purchases; limiting the number of guns retailers could sell at one time to one customer; requiring dealers to ask questions of customers seeking multiple purchases; and sanctioning dealers who fail to comply with these requirements.

(2) determining whether the moving party has made an adequate showing that negates the opponent's claim, and (3) determining whether the opposing party has raised a triable issue of fact." (*Beroiz v. Wahl* (2000) 84 Cal.App.4th 485, 491 [100 Cal.Rptr.2d 905].) That three-step process is useful in framing and assessing the issues in this densely documented case.

### Issues Framed by the Pleadings

The complaints allege that the defendants have marketed handguns using practices that encourage sales to unauthorized users without adequately monitoring their distributors and dealers or setting standards for distributors and dealers regarding how to legally and responsibly sell handguns.

Specific unfair policies include: failing to place controls on the actions of retail dealers; distribution policies that make sales to straw men likely; sales of large numbers of handguns in a single transaction; allowing sales to "kitchen table" dealers who do not maintain retail places of business; failing to prevent sales by private citizens at gun shows; distributing guns to dealers without ensuring that the dealers adequately check purchasers' identification for accuracy; distributing more guns than defendants reasonably expect to sell to legal purchasers; and failing to monitor gun sales in jurisdictions outside California with weak gun control laws.

In addition, the complaints alleged that defendants design guns without making serial numbers tamper-proof, and that they design handguns to appeal to criminals without incorporating safety features to prevent unintentional shootings and unauthorized use. The complaints also alleged that defendants engaged in a "campaign of deception and misrepresentation concerning the dangers of their firearms" by implying that gun ownership will increase home safety. The parties have not addressed issues regarding gun design or false advertising on appeal.[12]

---

[12] We note plaintiffs have not alleged a tort action for products liability that requires elements of breach of duty and legal causation. Plaintiffs find significance in the repeal of former Civil Code section 1714.4 and argue that Civil Code section 1714 now singles out gun manufacturers as having a duty to use ordinary care under the relevant circumstances. Civil Code section 1714, subdivision (a) provides in part: "The design, distribution, or marketing of firearms and ammunition is not exempt from the duty to use ordinary care and skill that is required by this section." Historical notes accompanying the amended version of section 1714 state that the repeal of section 1714.4 was not intended to create new causes of action against manufacturers of firearms, but to preserve all actions against them, including products liability, nuisance and statutorily based actions. (See *Historical and Statutory Notes*, 9A West's Ann. Civ. Code (2004 supp.) foll. § 1714, p. 12.) That the defendants in this case may have a duty to use ordinary care in the conduct of their business does not create a duty to initiate an affirmative program of investigation and sanctioning of wayward retailers.

Each of the three complaints also alleged creation of a public nuisance. Specifically, the complaints alleged that California residents are injured and killed by firearms supplied to criminals. The complaints alleged that defendants' conduct results in supplying thousands of handguns to the illegitimate secondary market that are illegally possessed and remain in the hands of criminals for years.

## *Moving Party's Showing to Negate Plaintiffs' Claims*

The theory of defendants' motion for summary judgment was that plaintiffs had no evidence that any defendant's act or omission caused any criminal to acquire a firearm. In addition, they argued that there was no evidence that any design feature of a firearm caused a shooting. Defendants also emphasized the existing extensive array of federal, state and local laws regulating firearms and urged the court to reject what defendants characterized as plaintiffs' mere policy arguments.

Defendants argued that plaintiffs did not produce evidence of a factual nexus between any defendant and incidents of firearm purchases by straw men, criminal acts by retailers, sales at gun shows or swap meets, sales to "kitchen table" vendors, firearms acquired by theft, multiple sales, acquisition of guns by criminals, accidental shootings, or intentional shootings.

Defendants relied on the deposition testimony of several of plaintiffs' experts, including Gerald Nunziato, a former official of the ATF and Joseph Vince, a former chief of the ATF and president of Crime Gun Solutions, a company that assists police in the collection and analysis of crime gun data. Excerpts from depositions were offered to show the absence of any link between defendants' conduct and the alleged harm. For example, Joseph Vince stated that it was his opinion that retailers showing sales of significant numbers of crime guns were "more likely than not selling guns that are being trafficked into the underground market." However, when pressed about the actual facts, Vince admitted that it is difficult "to determine whether each gun recovered in a criminal investigation was diverted into the underground market because of a specific business practice of a gun dealer." He also stated: "[I]t is inherently difficult to say with certainty that a specific dealer is 'corrupt' or is 'knowingly' selling guns to straw purchasers, as opposed to negligently facilitating such sales, unless one can witness sales transactions at the dealership first hand." Vince conceded that additional data

must be located and analyzed to determine the history of the crime gun before a conclusion of wrongdoing by a retailer can be drawn.[13]

Similarly, Gerald Nunziato admitted during his deposition that the fact a gun dealer sold numerous crime guns, without more data, does not support a conclusion of wrongdoing. Nunziato suggested that gun manufacturers should undertake to examine the gun tracing data and question dealers who are selling a large number of crime guns and then, if it is concluded that wrongdoing took place, to stop selling to those dealers or initiate training programs on prevention of gun theft, maintenance of accurate records and following appropriate sales procedures. Defendants' showing was sufficient to shift the burden to plaintiffs.

### Plaintiffs' Attempted Showing of a Triable Issue of Fact

Plaintiffs argued that an action brought under section 17200 assesses only the extent to which a defendant has created an unreasonable risk to the public, and does not concern concepts of negligence law such as duty and causation. They presented studies showing the methods used by criminals to obtain guns from irresponsible gun retailers, including straw man purchases, thefts, and multiple sales.

Plaintiffs offered declarations from firearm experts stating their opinions that retailers linked to a significant number of such sales were more likely than not engaged in sales to gun traffickers or high-risk business practices that facilitate diversion of guns to the criminal market. For example, the declaration of Joseph Vince stated that various federal reports indicated a small percentage of licensed retailers, or FFL's are responsible for guns traced to crimes. Vince stated that it was his opinion, based on his experience, that FFL's with significant numbers of guns sold that are traced as being used in crimes, were "more likely than not selling guns that are being trafficked into the underground market." Vince's other conclusions were also phrased in terms of his opinion of what would be good policy. For example, Vince believed "[i]t should be incumbent upon [the FFL's] and the manufacturers and distributors who supply them . . . to take steps necessary to prevent gun thefts . . . ."

The evidence presented by plaintiffs was predominately information pertaining to the gun industry as a whole. Plaintiffs presented several gun tracing

---

[13] One anecdotal example illustrates this point. A gun was recovered in 1998 pursuant to a warrant served on a residence where narcotic and firearm trafficking was occurring. This crime gun was traced to an original sale by a retailer in 1970. When further facts were examined, it turned out that the original purchaser was a police officer and the retailer was innocent of wrongdoing.

profiles prepared by Nunziato and analyzed by Vince concluding that firearms recovered in crimes in California were sold through FFL's that exhibited many of the ATF's gun trafficking indicators.[14] The ATF's information was available to any defendant who requested it.

One tracing profile showed FFL's associated with each defendant distributor, the number of guns sold by the FFL and included in the crime gun trace database from 1995 to 2001 (with dealer identities redacted after 1996) and showed percentages of guns with high-risk factors.[15] Plaintiffs also offered a California dealer profile that associated high-risk gun trafficking indicators with each FFL.

Plaintiffs' expert Gerald Nunziato concluded that the profiles and data he reviewed indicated that all defendants sold firearms that were recovered in crimes and traced. He also concluded that the traced guns were sold through numerous dealers that showed significant high-risk indicators of gun trafficking. He also opined that the defendants could have gathered and analyzed the same data plus additional data from their own files to help identify the high-risk dealers and utilize this information to "self-police their distribution partners . . . ."

Plaintiffs also offered the declaration of Carole Bridgewater, former gun shop owner and secretary/treasurer of the National Alliance of Stocking Gun Dealers stating that the gun industry has known "for a long time that there are serious problems in the way it distributes its products." This declaration is filled with unsupported statements of Bridgewater's opinion such as the assertion that anyone can get a federal firearms license, even with a prison address or issued in the name of the person's dog. Bridgewater opined that the willingness of manufacturers and distributors to sell to anyone with a federal license "feeds the black market for guns."

Attorney Robert Ricker, a former gun lobbyist, stated in his declaration that gun manufacturers and distributors know of illegal practices by some

---

[14] Trafficking indicators include multiple crime guns traced to an FFL or first retail purchaser, short time to crime for guns traced to an FFL, incomplete trace results due to an unresponsive FFL, frequently reported firearms thefts by an FFL, frequent multiple sales and recovery of firearms with obliterated serial numbers.

[15] Taking one line from the spreadsheets as an example of the data presented, Andrew's, under one of its federal license numbers, showed 358 traced guns sold between January 3, 1995 and December 31, 2001. Under a different license number, only 10 guns were reported. Many factors besides illegal conduct could explain what appears to be a relatively high number of crime guns, including a large overall volume of sales. At argument before the trial court, Andrew's counsel represented that the company sold approximately 176,000 firearms between 1995 and 1999. This example illustrates the fact that a manufacturer reviewing the raw data, without further investigation and analysis, would not be justified in imposing sanctions on a particular FFL.

retailers, but adopt a "see-no-evil, hear-no-evil, speak-no-evil" approach rather than requiring retailers to stop making questionable gun sales. He stated that industry leaders stifled discussions about the gun industry's taking voluntary action to control the distribution of guns. In Ricker's opinion, if manufacturers investigated retailers whose records reflect a disproportionate number of crime gun traces, high-risk retail gun transfers would decrease.

Plaintiffs listed a number of proposed business practices that manufacturers and distributors could require of all their dealers that they claimed would cut down on black market sales of guns. They argued that the expert declarations and statistical profiles established a material factual issue regarding the gun manufacturers' liability for engaging in unfair business practices under the UCL and for creating a nuisance.

Bearing in mind the allegations of the complaint and the evidence produced in connection with the summary judgment motion, we turn to an analysis of the UCL and its application to the issues outlined and the facts produced by the parties.

*UCL Definition of "Unfair"—Need for a Showing of Causation*

"The UCL is intended to proscribe 'unfair or fraudulent business act[s] or practice[s] and unfair, deceptive, untrue or misleading advertising . . . .' [Citation.]" (*Cruz v. PacifiCare Health Systems, Inc.* (2003) 30 Cal.4th 303, 315 [133 Cal.Rptr.2d 58, 66 P.3d 1157].) Section 17200 defines unfair competition to "mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code." The statute does not define the term "unfair," but recently in *Cel-Tech, supra,* 20 Cal.4th 163 our Supreme Court signaled the need to put restrictions on its potentially limitless application.

Plaintiffs argue that *Cel-Tech* does not apply in this case and urge use of the pre-*Cel-Tech* definitions of an unfair practice. Plaintiffs contend that the trial court applied the wrong standard in deciding whether there was an issue of fact as to whether defendants' actions were "unfair" under the UCL.[16]

The pre-*Cel-Tech* definition includes a broad balancing test and a more amorphous public policy test. " 'The test of whether a business practice is unfair "involves an examination of [that practice's] impact on its alleged

---

[16] Except for the public nuisance argument, discussed *post,* plaintiffs have not alleged an unlawful or fraudulent practice, and focus on the unfair provision of the UCL.

victim, balanced against the reasons, justifications and motives of the alleged wrongdoer. In brief, the court must weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim . . . ." ' [Citations.] . . . 'an "unfair" business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.' [Citation.]" (*South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861, 886–887, & fn. 24 [85 Cal.Rptr.2d 301] (*South Bay*) [noting disapproval of this standard in *Cel-Tech* in the competitor context].)

Plaintiffs argue that a finding of unfairness under the first pre-*Cel-Tech* test requires only a showing that defendants engaged in a business practice that offended the public policy of keeping guns out of the hands of criminals. Under the balancing test, plaintiffs argue that distributing guns to retailers who engage in high-risk practices is so dangerous to the public as to outweigh any benefit of defendants' business practice. They contend that they presented sufficient evidence to demonstrate a disputed factual issue under this test.

■ According to plaintiffs, the trial court improperly injected the tort element of legal causation into the analysis. Plaintiffs refer to the trial court's statements that "there must be some causal connection between the harm and some conduct by the defendants" as betraying improper reliance on concepts of proximate cause. We do not read the court's comment so strictly. In context, the court was referring, not to concepts of legal causation, but to the need to show some connection between conduct by defendants and the alleged harm to the public. Even in a UCL unfairness case, there must be such a connection. Without evidence of a causative link between the unfair act and the injuries or damages, unfairness by itself merely exists as a will-o'-the-wisp legal principle.

Plaintiffs rely in part on *Committee on Children's Television, Inc. v. General Foods Corp.* (1983) 35 Cal.3d 197 [197 Cal.Rptr. 783, 673 P.2d 660] (*Committee on Children's Television*), to argue that causation is not a consideration in a UCL case. In *Committee on Children's Television,* the court stated: "To state a cause of action under [statutes prohibiting false, unfair, misleading, or deceptive advertising, including section 17200] for injunctive relief, it is necessary only to show that 'members of the public are likely to be deceived.' [Citations.] Allegations of actual deception, reasonable reliance, and damage are unnecessary." (*Id.* at p. 211.) Plaintiffs argue that the Supreme Court's omission of a discussion of causation in *Committee on Children's Television* indicates that tort-based analysis is inappropriate. But *Committee on Children's Television* arose as an appeal from the sustaining of a demurrer. Causation was not an issue in that case because it was clear that

the challenged advertisements caused the harm by misleading consumers into thinking that sugared cereals were nutritious foods. The plaintiffs set forth a direct causal relationship between the conduct of false advertising and the harm of purchasing sugared cereals.

Other UCL cases demonstrate the need for some connection between the wrongdoing and the harm. For example, in *South Bay,* the court found no unfairness in a lender's financing practices where the borrowers were aware of the widely used practice. (*South Bay, supra,* 72 Cal.App.4th at pp. 887–888.) Because the acts of the lender did not deceive the borrowers, causation was absent and the practice could not be deemed unfair. In this case, plaintiffs' own complaints assume the need for some showing of causation, as evidenced by the allegations that "as a result of" defendants' practices "thousands of California residents have died, suffered serious bodily injury, and been exposed to increased criminal activity involving handguns."

Although we do not interpret the prior cases as totally dispensing with the element of causation, if, as plaintiffs urge, the pre-*Cel-Tech* cases would allow a finding of unfairness without such a connection, we believe the reasoning of *Cel-Tech* compels rejection of those standards.

### *The Impact of the Court's Decision in* Cel-Tech

In *Cel-Tech, supra,* 20 Cal.4th 163, our Supreme Court rejected prior definitions of unfairness as "too amorphous." (*Id.* at pp. 184–185.) The court recognized that "[v]ague references to 'public policy,' for example, provide little real guidance." (*Id.* at p. 185.) The court sympathized with the need for businesses in California to have a "reasonable certainty" of the conduct permitted by California law. In keeping with the policy of encouraging competition, the court determined that a more precise definition was necessary. (*Ibid.*)

The *Cel-Tech* court observed: "Although the unfair competition law's scope is sweeping, it is not unlimited. Courts may not simply impose their own notions of the day as to what is fair or unfair." (*Cel-Tech, supra,* 20 Cal.4th at p. 182.) For that reason, the court took care to ensure that the definition of unfairness to competitors under section 17200 was "tethered to some legislatively declared policy or proof of some actual or threatened impact on competition." (*Id.* at pp. 186–187.) The court referred to federal court interpretations of the Federal Trade Commission Act (FTC Act) for such policy guidelines.

Accordingly, the court defined "unfair" in the context of an action by a plaintiff claiming injury from a competitor's act as conduct "that threatens

an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." (*Cel-Tech, supra,* 20 Cal.4th at p. 187, fn. omitted.) The court expressly stated that its definition is not applicable to actions brought by consumers, but its disapproval of the older unstructured definitions of unfairness cannot be ignored. (*Id.* at p. 187, fn. 12.)

As this court noted in *Gregory v. Albertson's Inc.* (2002) 104 Cal.App.4th 845, 854 [128 Cal.Rptr.2d 389]: "*Cel-Tech*, however, may signal a narrower interpretation of the prohibition of unfair acts or practices in all unfair competition actions and provides reason for caution in relying on the broad language in earlier decisions that the court found to be 'too amorphous.' Moreover, where a claim of an unfair act or practice is predicated on public policy, we read *Cel-Tech* to require that the public policy which is a predicate to the action must be 'tethered' to specific constitutional, statutory or regulatory provisions. [Fn. omitted.]"

In *Schnall v. Hertz Corp.* (2000) 78 Cal.App.4th 1144 [93 Cal.Rptr.2d 439], the court considered the manner in which the *Cel-Tech* court's analysis limited the broad scope of the UCL. (*Id.* at pp. 1154, 1166.) The court acknowledged that the *Cel-Tech* definition applied to actions between competitors, but also concluded that its analysis should be considered even in consumer cases. The court adopted the *Cel-Tech* reasoning to the extent of determining that the concept of unfairness under the UCL should be grounded in a legislatively declared policy rather than defined by the more amorphous pre-*Cel-Tech* definitions. (*Id.* at p. 1166.)

The FTC Act is an aid to interpretation of the UCL, as noted in *Cel-Tech.* (*Cel-Tech, supra,* 20 Cal.4th at p. 186; see also *Lavie v. Procter & Gamble Co.* (2003) 105 Cal.App.4th 496, 507 [129 Cal.Rptr.2d 486] [California courts rely on FTC Act when interpreting provisions of the UCL].) The *Cel-Tech* court noted that section 5 of the FTC Act proscribes unfair methods of competition, pertaining to competitors, but it also proscribes unfair or deceptive practices, pertaining to consumers as well as competitors. (*Cel-Tech, supra,* 20 Cal.4th at p. 186, fn. 11.) Although the court stated that federal authority was not controlling, it characterized it as " 'more than ordinarily persuasive.' " (*Cel-Tech, supra,* at pp. 185–186.)

We follow the lead of the *Cel-Tech* court in consulting parallel federal authority to assist in determining the appropriate reach of the UCL. (*Cel-Tech, supra,* 20 Cal.4th at pp. 185–187.) Federal authorities clearly require a causative link between the defendant's actions and the resulting harm. The FTC Act requires the suspect practice to cause the alleged injury

and precludes reliance on public policy as the sole support for a finding of unfairness. The act states: "The [Federal Trade] Commission shall have no authority . . . to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition. In determining whether an act or practice is unfair, the Commission may consider established public policies as evidence to be considered with all other evidence. Such public policy considerations may not serve as a primary basis for such determination." (15 U.S.C. § 45(n).)

To satisfy the federal definition of unfairness, the practice must cause or be likely to cause substantial injury, must not be outweighed by countervailing benefits, and the injury must be one that consumers themselves could not reasonably avoid. (*Orkin Exterminating Co., Inc. v. F.T.C.* (11th Cir. 1988) 849 F.2d 1354, 1364 (*Orkin*).) Although the weighing test of the pre-*Cel-Tech* cases remains useful, the challenged practice must be the likely cause of substantial injury. (*Orkin, supra,* at pp. 1364–1365.) The latter element was not supported by the plaintiffs' showing in this case.

In light of the Supreme Court's caution that businesses must be able to "know, to a reasonable certainty, what conduct California law prohibits and what it permits," we do not believe a UCL violation may be established without a link between a defendant's business practice and the alleged harm. (*Cel-Tech, supra,* 20 Cal.4th at p. 185.) If we view this case employing a standard influenced by federal authority analogous to that explained in the context of competitor suits in *Cel-Tech,* plaintiffs have failed to present any evidence of the first prong of that test: that defendants' business practices caused or were likely to cause substantial injury. (*Orkin, supra,* 849 F.2d at p. 1364.) The UCL provisions are not so elastic as to stretch the imposition of liability to conduct that is not connected to the harm by causative evidence.

Moreover, none of the post *Cel-Tech* cases that have continued to use the balancing test for the unfairness prong in consumer cases have dispensed with the need for some causal connection when weighing the utility of the defendant's conduct against the gravity of the harm to the alleged victim. The offensive unfair business practices are injurious in some causative way to consumers. (See, e.g., *Searle v. Wyndham Internat., Inc.* (2002) 102 Cal.App.4th 1327, 1334 [126 Cal.Rptr.2d 231]; *People ex rel. Renne v. Servantes* (2001) 86 Cal.App.4th 1081, 1095 [103 Cal.Rptr.2d 870] [the unfair conduct caused substantial injuries to the unwitting victims]; and *Pastoria v. Nationwide Ins.* (2003) 112 Cal.App.4th 1490, 1498 [6 Cal.Rptr.3d 148] [weighing of the competing interests of the impact of the

practice on its alleged victim against the reasons and justifications of the alleged wrongdoer. Wrongdoer may have caused insured to purchase inferior insurance].)

*Application of Other Unfair Competition Cases to the Facts of This Case*

Plaintiffs argue that the case of *American Philatelic Society v. Claibourne* (1935) 3 Cal.2d 689 [46 P.2d 135] (*Claibourne*) illustrates the appropriate focus on whether a defendant created a risk of harm rather than on strict tort causation. But the *Claibourne* case did not dispense with the element of a causative link. Also, it is distinguishable from this case for several reasons. It was an action by competing vendors against a defendant who marked and perforated official postage stamps so that they resembled rare and expensive collectible stamps. (*Id.* at p. 692.) Although defendant marketed the stamps to dealers as having "unofficial separation," he told the dealers they could realize a "handsome profit" by reselling the misleading stamps. (*Id.* at pp. 694–695.) The court determined that defendant's marketing solicitation was susceptible to the inference that dealers could make large profits by reselling the counterfeit stamps as genuine government perforated stamps. (*Id.* at p. 695.) The court stated that if defendant obtained a higher price for the stamps that was due to the possibility of the stamps' being palmed off as genuine, he had obtained an "advantage grounded in fraud and deceit and secured a benefit to himself to which he is not in honesty and fair dealing entitled." (*Id.* at p. 696.)

The product that the *Claibourne* defendant placed into distribution was faulty when it left his hands, even though he left the additional wrongful act of palming off for others to perform. The court in *Claibourne* did not engage in a discussion of causation because that element of the violation was clear: defendant directly furnished "unscrupulous dealers with an instrument of fraud" and inferred in his marketing materials that the dealers could make large profits by selling the items as genuine. (*Claibourne, supra,* 3 Cal.2d at p. 695.) The court stated, "There can be no question" that defendant's practice would diminish the value of the genuine stamps and result in pecuniary loss to the plaintiffs. (*Id.* at p. 696.)

Unlike the defendant in *Claibourne*, defendants here have produced no misleading, counterfeit, or otherwise defective product for purposes of defrauding consumers. Without some hint of participation or encouragement of wrongful conduct, there is no connection between defendants and the alleged wrongdoing. The only business practice the defendants in this case have engaged in is marketing their product in a lawful manner to federally licensed dealers. *Claibourne* does not establish a rule eliminating causation.

*Emery v. VISA Internat. Service Assn.* (2002) 95 Cal.App.4th 952 [116 Cal.Rptr.2d 25] (*Emery*) is instructive. In that case, the plaintiff brought an action for unfair business practices and deceptive advertising against VISA because illegal foreign lotteries mailed solicitations to California citizens that allowed payment by VISA bank cards. The Court of Appeal affirmed a summary judgment for VISA, rejecting plaintiff's theory that VISA somehow aided and abetted the illegal conduct by failing to prevent it. Plaintiff admitted that VISA was not involved in the distribution of the lottery solicitations, but argued that once it learned of the lottery mailing using its name, it should have done more to stop the illegal solicitation. (*Id.* at p. 957.) Expert testimony concluded that the presence of the VISA name on the solicitation encouraged readers to participate. (*Id.* at p. 958.)

The court explained that an unfair practices claim cannot be based on vicarious liability, but must contain an element of the defendant's "personal 'participation in the unlawful practices' and 'unbridled control' over the practices that are found to violate section 17200 or 17500." (*Emery, supra,* 95 Cal.App.4th at p. 960.) VISA exercised no control over the acts of those preparing the lottery solicitation and had no relationship with the merchants who did. (*Ibid.*)

Plaintiffs in this case argue that, unlike VISA, the gun manufacturers have a relationship with the wrongdoers, and in fact, supply them with the guns that are subsequently improperly sold. But the *Emery* case bears more of a resemblance to this case than plaintiffs concede. VISA was not involved in the wrongful distribution of the lottery solicitations, but VISA did facilitate transferring funds among its member financial institutions and authorized those institutions to accept VISA bank cards in lieu of cash. It also published regulations governing each member institution's participation in its payment system. (*Emery, supra,* 95 Cal.App.4th at p. 956.) Because of its reputation, standards and business practices, the use of the VISA logo added authenticity to the lottery solicitations, but, like defendants here, VISA did not monitor or police the third parties that misused its logo and caused harm to the public. (*Id.* at pp. 959, 962.) Nevertheless, the *Emery* court concluded that VISA played no part in the actual wrongdoing and had not committed an unfair practice. (*Id.* at p. 964.)

An analogous non-section-17200 case that helps to illustrate the missing elements in plaintiffs' theory is *Direct Sales Co., Inc. v. United States* (1943) 319 U.S. 703 [87 L.Ed. 1674, 63 S.Ct. 1265] (*Direct Sales*). In *Direct Sales* the United States Supreme Court affirmed the criminal conspiracy conviction of a pharmaceutical manufacturer that had been supplying large quantities of morphine to a Dr. Tate, who was dispensing illegal quantities of the drug to addicts and drug dealers. (*Id.* at pp. 704–708.) The facts developed at trial

showed that the average physician did not require more than 400 one-quarter-grain tablets annually for legitimate use, while Dr. Tate ordered up to 5,000 to 6,000 one-half-grain tablets a month in a six-month period. (*Id.* at p. 706.) The defendant manufacturer offered Dr. Tate a mail order sales plan with 50 percent discounts that "pushed" quantity sales. Unlike other manufacturers that listed morphine in quantities not exceeding 100 tablets, defendant listed them in units of up to 5,000 tablets. (*Ibid.*)

The federal Bureau of Narcotics warned the defendant in *Direct Sales* that it was being used as a drug supply source by convicted physicians and expressly told defendant that an average doctor would order no more than 200 to 400 one-quarter-grain tablets annually. Although the defendant stopped filling orders from Dr. Tate for more than 1,000 one-half-grain tablets, it continued to supply that amount whenever Dr. Tate submitted an order, and advised him to submit separate order forms. (*Direct Sales, supra,* 319 U.S. at p. 707.) In a single year, 27 percent of the doctors convicted of illegal drug distribution were defendant's customers. (*Id.* at p. 707, fn. 4.) The court noted, "[N]ot every instance of sale of restricted goods, harmful as are opiates, in which the seller knows the buyer intends to use them unlawfully, will support a charge of conspiracy." (*Id.* at p. 712.) But the court concluded that the facts of the case established more than mere sales of supplies that are subsequently misused by the buyer. The defendant's business practices established not only knowledge of the buyer's intended misuse, but an affirmative intent to actively stimulate and cooperate in the illegality. (*Id.* at pp. 711–712.)

Although the quantum of evidence necessary to uphold a criminal conviction is substantially greater than is needed to show an unfair business practice, the *Direct Sales* case illustrates the nature of the link between the third party's illegal acts and the participation of the supplier before the supplier can be held legally responsible for the third party's misuse of the product. *Direct Sales* did not involve an attempt to prosecute every mail order drug company for the acts of a few wayward physicians. Neither was there an attempt to punish every sale of morphine to buyers that illegally resold it. Furthermore, when warned by federal authorities that customers were illegally reselling the defendant's goods, the defendant in *Direct Sales* did not merely fail to act, but changed its practices to circumvent the government's proposed restrictions and affirmatively advised the doctor to do the same. All of these facts distinguish the activity in *Direct Sales* from the activity of the gun manufacturer and distributor defendants in this case.

No evidence in this case hints that any of the manufacturer defendants provided weapons to criminals or failed to properly record sales or did any of the other acts that plaintiffs characterize as high-risk business practices. They

did not control the wrongful acts or encourage others to engage in questionable acts. Neither did they change their business practices to avoid proposed regulations or advise retailers on ways to circumvent the law. The record in this case shows that the only business practice that these defendants engage in is the manufacture and sale of firearms to dealers that are licensed as such by the federal government. Plaintiffs have cited no cases finding a manufacturer has engaged in an unfair practice solely by legally selling a nondefective product based on actions taken by entities further along the chain of distribution. Even plaintiffs' experts could not present an evidentiary link between the manufacturer of a firearm and a retail gun dealer who sold guns that ended up in criminal circumstances.

It is important to emphasize that the evidence presented did not show that any defendant had actual knowledge that specific retailers were illegally supplying guns to the crime gun market or took any action to aid or encourage such activity. At best, defendants had access to inconclusive statistics concerning the actions of a minority of retailers. Nunziato himself admitted that data indicating a retailer sold numerous crime guns, without more, would not support a conclusion of wrongdoing. Plaintiffs' evidence raises only a suspicion regarding the acts of a small number of retailers that may justify additional investigation and factfinding. While that evidence may be sufficient to justify a trial of the retailers, it does not implicate any act by the manufacturers.

Furthermore, the crime gun trace data and expert declarations did not, without more specific evidence, establish wrongdoing on the part of a specific retailer such that viewing the data alone would justify imposition of sanctions for gun trafficking. (See, e.g., *Hamilton v. Beretta U.S.A. Corp.* (2001) 96 N.Y.2d 222, 237, fn. 5 [727 N.Y.S.2d 7, 750 N.E.2d 1055] (*Hamilton*) [noting federal data tracing crime guns to FFL's, and stating: "However, the data does not reveal whether any given FFL's high incidence of crime gun sales is attributable to irresponsible conduct, or merely reflects a high volume of legal sales or some other activity (such as theft) over which the FFL has no control."] Where the evidence in this case did support the inference that some retailers engaged in high-risk sales, the trial court denied summary judgment as to those entities.[17]

While plaintiffs' attempt to add another layer of oversight to a highly regulated industry may represent a desirable goal, the record in this

---

[17] We reject plaintiffs' argument that the trial court improperly drew adverse factual conclusions when it noted that the evidence did not connect defendants with facilitating the diversion of guns to the underground market. The court was merely acknowledging that plaintiffs' own experts admitted during their depositions they could not conclude that sales of crime guns necessarily indicated the dealer was engaged in wrongdoing, and admitted that any traced crime gun could have been originally sold to a legal purchaser.

case does not present sufficient evidence to impose unannounced and uncodified requirements on business enterprises based on an expert's opinion of what constitutes good public policy.[18] As the Supreme Court noted in *Cel-Tech, supra,* 20 Cal.4th at page 185, the concept of public policy is difficult to define, and courts should hesitate to impose such policy " '. . . "lest they mistake their own predilections for public policy which deserves recognition at law." ' " Establishing public policy is primarily a legislative function and not a judicial function, especially in an area that is subject to heavy regulation. ██ None of the evidence presented by plaintiffs supports the conclusion that a manufacturer who does not undertake the kind of investigation and remedial action urged by plaintiffs and their experts has engaged in an unfair practice. Although the boundaries of section 17200 are broad and sometimes difficult to define, in this case we find no evidence of a connection between potentially errant gun retailers and any unfair business practice of defendants.[19]

*The Trial Court Properly Rejected Plaintiffs' Nuisance Theory*

██ Plaintiffs' complaints alleged that defendants' conduct constitutes a public nuisance because it results in supplying handguns to the criminal market that remain in the hands of criminals for years and causes death and injury to the public. Plaintiffs contend that the trial court ignored the public nuisance cause of action, which, if supported, could also establish a violation of section 17200. (*Farmers Ins. Exchange v. Superior Court* (1992) 2 Cal.4th 377, 383 [6 Cal.Rptr.2d 487, 826 P.2d 730].) But the court did discuss the

---

[18] Gun sales are already heavily regulated at the federal, state and local levels. (See, e.g., 18 U.S.C. §§ 922–924; *Hamilton, supra,* 750 N.E.2d at p. 1066, fn. 9 [listing federal gun regulations]; *Great Western Shows, Inc. v. County of Los Angeles* (2002) 27 Cal.4th 853 [118 Cal.Rptr.2d 746, 44 P.3d 120] [county ordinance prohibited sale of firearms on county property].) California regulates gun sales and use more extensively than many states. (Pen. Code §§ 12000–12098 [The Dangerous Weapons Control Law]; Bang, *Trigger Locks and Warning Labels on Firearms Become a Reality* (2000) 31 McGeorge L.Rev. 265, 267 [noting that California's gun control laws are among the most stringent in the country]; see also *Public Policy Perspectives, supra,* 73 Fordham L.Rev. at pp. 604–605.) The fact of such extensive existing regulation counsels caution before imposing an additional layer of judicial requirements.

Contrary to plaintiffs' argument, we are not determining that we are required to abstain from deciding the issues. Rather, we are deciding the issues, albeit adversely to plaintiffs' position.

[19] Plaintiffs also argue that the trial court mistakenly found that defendants could not be liable for nonfeasance and improperly imported concepts of duty into the UCL analysis. We do not discuss the issue of duty, because the absence of causation requires affirmance of the summary judgment. Nor are we precluding actions against gun manufacturers under section 17200 or nuisance where causation is established.

issue of public nuisance in its opinion and concluded that plaintiffs' evidence failed to show causation, a necessary element of a public nuisance claim.[20]

 A nuisance is: "anything that is 'injurious to health, . . . or is indecent or offensive to the senses, or an obstruction to the free use of property, [that] interfere[s] with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway,' . . . [Citation.] Civil Code sections 3480 and 3481 divide the types of nuisance into public and private. A public nuisance is one which 'affects at the same time an entire community or neighborhood, or any considerable number of persons.' (Civ. Code, § 3480.)" (*People ex rel. Gallo v. Acuna* (1997) 14 Cal.4th 1090, 1104 [60 Cal.Rptr.2d 277, 929 P.2d 596].)[21]

 Plaintiffs assert that the Restatement Second of Torts (Restatement) section 821B provides that no showing of causation is necessary when only an injunction is sought. They contend that they need only show that defendants created a risk of some threatened harm. The Restatement is not so loosely worded. Section 821B, subdivision (2) explains: "Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following: (a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience, or (b) whether the conduct is proscribed by a statute, ordinance or administrative regulation, or (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right." This listing of examples of public nuisance illustrates the need for a relationship between the conduct and the impending harm.

[20] Referring to its prior order to produce documents reflecting criminal disposition of firearms, the court stated: "As could be expected in a case of this magnitude, discovery has produced a mountain of data, . . . Significantly, however, none of this data reflects evidence of the type of transactions complained of by plaintiffs . . . which can be causally attributed to these moving manufacturers and distributors."

[21] We reject defendant Sturm, Ruger & Company, Inc.'s assertion that public nuisance actions must relate to the use or condition of real property. Public nuisance is not so limited. (See, e.g., *People ex rel. Gallo v. Acuna, supra,* 14 Cal.4th 1090 [upholding injunction against neighborhood street gang activity]; *Venuto v. Owens-Corning Fiberglas Corp.* (1971) 22 Cal.App.3d 116 [99 Cal.Rptr. 350] [nuisance includes interference with public health, comfort and convenience]; and *Martinez v. Pacific Bell* (1990) 225 Cal.App.3d 1557, 1565 [275 Cal.Rptr. 878] [quoting Professor Prosser's description of nuisance as broad enough to encompass everything from " 'an alarming advertisement to a cockroach baked in a pie.' "]; see also Rest.2d Torts, § 821B, com. h, p. 93 [stating that public nuisance does not necessarily involve interference with use of the land].)

Thus, a defendant's action must not only create a risk of some harm, it must also be likely to lead to invasion of the public right at issue.[22]

■ The language of the Restatement presumes that the necessary elements for proof of a cause of action for public nuisance include the existence of a duty and causation. (Rest., *supra*, § 824(b), & com. a, p. 116.) "The conduct necessary to make the actor liable for either a public or a private nuisance may consist of (a) an act; or (b) a failure to act under circumstances in which the actor is under a duty to take positive action to prevent or abate the interference with the public interest or the invasion of the private interest." (Rest., *supra*, § 824.) If a plaintiff could obtain an injunction absent a showing of causation of an interference with a public right, the plaintiff could enjoin the manufacturing of a firearm solely because the mere existence of the firearm creates a risk of harm. A connecting element to the prohibited harm must be shown.

Cases cited by plaintiffs as examples of public nuisance in other contexts are distinguishable because the acts of defendants in those cases were illegal or violated regulatory provisions and did more than create a risk of harm. The actions of the defendants in the cited cases were highly likely to cause imminent harm to the public. (See, e.g., cases cited in Prosser & Keeton, Torts (5th ed. 1984) § 90, p. 644.) The cases do not support plaintiffs' claim that they only need to show that a defendant created a risk of harm.

■ Although it is not necessary to show that harm actually occurred, plaintiffs must show that a defendant's acts are likely to cause a significant invasion of a public right. "Again, either a public or a private nuisance may be enjoined because harm is threatened that would be significant if it occurred, and that would make the nuisance actionable under the rule here stated, although no harm has yet resulted." (Rest., *supra*, § 821F, com. b, p. 105.) "Thus the threat of communication of smallpox to a single person may be enough to constitute a public nuisance because of the possibility of an epidemic; and a fire hazard to one adjoining landowner may be a public nuisance because of the danger of a conflagration." (Rest., *supra*, § 821B, com. g, pp. 92–93.)

■ Merely engaging in what plaintiffs deem to be a risky practice, without a connecting causative link to a threatened harm, is not a public nuisance. (See, e.g., *Selma Pressure Treating Co. v. Osmose Wood Preserving Co.* (1990) 221 Cal.App.3d 1601, 1620 [271 Cal.Rptr. 596] [defendants who

---

[22] Comment f of section 821B of the Restatement is also relevant to this case, and states: "In addition, if there has been established a comprehensive set of legislative acts or administrative regulations governing the details of a particular kind of conduct, the courts are slow to declare an activity to be a public nuisance if it complies with the regulations. . . ."

were directly involved in creating or assisting in creating a system that caused hazardous wastes to be disposed of improperly, thereby causing pollution of ground or surface waters, can be liable under the law of nuisance]; *City of Bakersfield v. Miller* (1966) 64 Cal.2d 93, 98–100 [48 Cal.Rptr. 889, 410 P.2d 393] [building code violations created risk of hotel being a fire hazard that would likely cause injury through allowing smoke to move quickly through open ducts to all floors]; *County of San Diego v. Carlstrom* (1961) 196 Cal.App.2d 485, 491 [16 Cal.Rptr. 667] [creation of risk of extreme fire hazard in residential community also caused the injury of instilling residents' fear of fire that resulted in liability for public nuisance]; see also Prosser & Keeton, Torts, *supra,* § 90, pp. 651–652, stating, "Then, there are those activities that are a 'public nuisance' because the defendant is engaged in a continuing course of conduct that is calculated to result in physical harm or economic loss to so many persons as to become a matter of serious concern. Such activities as practicing law or medicine without a license would be included in this category.")

In this case, there is no causal connection between any conduct of the defendants and any incident of illegal acquisition of firearms or criminal acts or accidental injury by a firearm. Defendants manufacture guns according to federal law and guidelines.

Plaintiffs list cases from other jurisdictions that have upheld public nuisance claims against gun manufacturers and distributors, arguing that the trial court erred by not following those cases. No California state case is cited that analyzes the issue. (See, e.g., *City of Modesto Redevelopment Agency v. Superior Court* (2004) 119 Cal.App.4th 28 [13 Cal.Rptr.3d 865], [noting out-of-state cases holding nuisance action may be maintained against gun manufacturers, but stating, "Our research reveals no California state cases holding such defendants liable for causing a nuisance"].)

The out-of-state cases allowing a nuisance action to go forward are distinguishable. In *Gary ex rel. v. Smith & Wesson Corp.* (Ind. 2003) 801 N.E.2d 1222, the court was considering a motion to dismiss, and evaluated only the face of the complaint, stating, "It remains for trial whether the City can establish the facts it alleges." (*Id.* at p. 1229.) Similarly, *James v. Arms Technology, Inc.* (2003) 359 N.J. Super. 291 [820 A.2d 27] (*James*), and *Cincinnati v. Beretta U.S.A. Corp.* (2002) 95 OhioSt.3d 416 [2002 Ohio 2480, 768 N.E.2d 1136], also cited by plaintiffs, are decisions on motions to dismiss and are not based on a party's inability to present evidence supporting the allegations in a complaint.[23]

---

[23] There has not been unanimous agreement among courts that have considered the issue. Some federal courts have refused to recognize claims of public nuisance against gun manufacturers. (See, e.g., *Camden Cty. Bd. of Chosen Freeh. v. Beretta U.S.A.* (D.N.J. 2000)

In *Ileto v. Glock, Inc.* (9th Cir. 2003) 349 F.3d 1191 (*Ileto*), a Ninth Circuit panel majority reinstated claims of negligence and nuisance against gun manufacturers and distributors brought by individual victims and survivors of an assault by a gunman. It is significant that the court declined to reinstate the action against manufacturers and distributors whose guns were not actually fired during the shooting because the claims for nuisance and negligence could not stand without a showing that those guns caused the alleged injury.[24] (*Ileto, supra,* at pp. 1194, 1216.) The court in *Ileto* was reviewing the grant of a motion under rule 12(b)(6) of the Federal Rules of Civil Procedure (28 U.S.C.) for failure to state a claim on which relief can be granted. The court relied solely on the allegations of the complaint and determined that if they could be proven, including causation, the plaintiffs would be entitled to relief. (*Ileto, supra,* at pp. 1194, 1209, 1216.)

This case has progressed beyond the pleading stage, and plaintiffs have been unable to produce evidence to show the existence of a triable issue of material fact on the pleaded theories. The negligence and nuisance theories advanced in *Ileto* were based on two contentions: (1) the defendants negligently created an illegal secondary market for guns by selling more guns than legal purchasers can buy; and (2) the defendants thereby developed distribution channels they knew would regularly provide guns to criminals. (*Ileto, supra,* 349 F.3d at pp. 1197–1198.) Even if we were to accept the *Ileto* court's interpretation of what our Supreme Court may decide when faced with this issue, the conclusions in that case (aside from the need to show causation) are not applicable here, where there is no evidence of either of the contentions underlying the causes of action in *Ileto.*

We find the views expressed by the dissenters to the denial of rehearing en banc in *Ileto* instructive. Circuit Judge Callahan explained the potential reach

123 F.Supp.2d 245 (*Camden I*), affd. 273 F.3d 536 (3rd Cir. 2001) (*Camden II*); *City of Philadelphia v. Beretta U.S.A. Corp.* (3rd. Cir. 2002) 277 F.3d 415.) Plaintiffs argue that *Camden I* was "discredited" in *James, supra,* 820 A.2d at pages 34 and 51. The court in *James* declined, on state law grounds, to adopt the analysis used in *Camden I,* but its holding was only that it would not dismiss the action at the pleading stage. (*James, supra,* at pp. 38, 44.) The *James* court repeatedly noted it was not considering plaintiff's ability to prove the allegations of the complaint. (*James, supra,* at pp. 34, 44, 47.) The Illinois Supreme Court reversed decisions cited by plaintiffs, finding that a cause of action for nuisance cannot be stated against gun manufacturers. (See *City of Chicago v. Beretta U.S.A. Corp.* (2002) 337 Ill.App.3d 1 [785 N.E.2d 16, 271 Ill.Dec. 365], revd. (Ill. 2004) 213 Ill.2d 351 [821 N.E.2d 1099, 290 Ill.Dec. 525] [holding gun manufacturers have no duty to prevent illegal use of their product]; and *Young v. Bryco Arms* (2001) 327 Ill.App.3d 948 [765 N.E.2d 1, 262 Ill.Dec. 175], revd. (Ill. 2004) 213 Ill.2d 433 [821 N.E.2d 1078, 290 Ill.Dec. 504] [holding manufacturing a gun is not the legal cause of injury produced by a gun-wielding killer not under the defendant's control].)

[24] The United States Supreme Court denied a petition for certiorari in *Ileto* on January 10, 2005. (*Ileto, supra,* 349 F.3d 1191, cert. den. *sub nom. China North Industries Corp. v. Ileto* (2005) 543 U.S. 1050 [160 L.Ed.2d 770, 125 S.Ct. 865].)

of the *Ileto* decision allowing the nuisance claim against defendant Glock, Inc., to go forward. "The potential impact of the panel's decision is staggering: Any manufacturer of an arguably dangerous product that finds its way into California can be hauled into court in California to defend against a civil action brought by a victim of the criminal use of that product. The manufacturer's liability will turn not on whether the product was defective, but whether its legal marketing and distribution system somehow promoted the use of its product by 'criminals and underage end users.' Thus, General Motors could be sued by someone who was hit by a Corvette that had been stolen by a juvenile. The plaintiff would allege that General Motors knew that cars that can greatly exceed the legal speed limit are dangerous, and through advertising and by offering discounts, it increased the attractiveness of the car and the number of Corvettes on the road and thus increased the likelihood that a juvenile would steal a Corvette and operate it in a injurious manner. [¶] This is not California law. . . ." (*Ileto v. Glock, Inc.* (9th. Cir. 2004) 370 F.3d 860, 862 (Callahan, J., dis. from denial of rehg. en banc).)

In addition, Circuit Judge Kozinski outlined cogent policy reasons against extending nuisance liability in this context. "Imposing novel tort theories on economic activity significantly affects the risks of engaging in that activity, and thus alters the cost and availability of the activity within the forum jurisdiction. In effect, it is a form of regulation administered through the courts rather than the state's regulatory agencies. It is, moreover, a peculiarly blunt and capricious method of regulation, depending as it does on the vicissitudes of the legal system, which make results highly unpredictable in probability and magnitude. Courts should therefore be chary of adopting broad new theories of liability, lest they undermine the democratic process through which the people normally decide whether, and to what degree, activities should be fostered or discouraged within the state. . . ." (*Ileto v. Glock, Inc., supra,* 370 F.3d at p. 868 (Kozinski, J., dis. from denial of rehg. en banc).) We agree with these policy comments and find them directly relevant to the potential result if plaintiffs' proposed remedies were implemented based on what was produced in opposition to the motion for summary judgment.[25]

Plaintiffs' public nuisance claim fails for lack of any evidence of causation. Their complaint attempts to reach too far back in the chain of distribution when it targets the manufacturer of a legal, nondefective product that lawfully distributes its product only to those buyers licensed by the federal government.

---

[25] Amicus Curiae Product Liability Advisory Council, Inc., has argued that the reforms advocated by plaintiffs amount to an illegal concerted refusal to deal, which it terms a classic anti-competitive practice. We make no comment on that assertion, but note it only to illustrate the complexities raised by attempting to use the courts to regulate an industry.

We do not hold that the theories asserted would never be tenable under different evidence. We merely find, based on the evidence presented here, that the evidence does not sufficiently establish the alleged acts of the defendants caused the diversion of firearms to the criminal market.[26]

## CONCLUSION

The appeal from the stipulated judgment regarding Ellett Brothers, Inc. in A105309 is hereby dismissed as having been taken from a nonappealable order. The summary judgment appealed from in A103211 is affirmed.

Stein, J., and Swager, J., concurred.

---

[26] We do not discuss plaintiffs' claims against the trade association defendants because our determination that the manufacturers were not shown to have caused the alleged harms renders the claims that the trade associations engaged in conduct to prevent manufacturers from changing their practices moot.